PAUL J. LAHR and CAROL LAHR, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Lahr v. Commissioner
Docket Nos. 15797-81, 24569-81, 12419-82, 24550-83, 31078-83.
United States Tax Court
T.C. Memo 1984-472; 1984 Tax Ct. Memo LEXIS 198; 48 T.C.M. (CCH) 1029; T.C.M. (RIA) 84472; September 5, 1984. Clarence J. Ferrari, Jr.,Edward *200 M. Alvarez,John M. Stinar, and Donald G. Dougherty, for the petitioners. M. K. Mortensen and Sylvia G. Lewellyn, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: In these consolidated cases, respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Taxable
Additions to Tax [2]
Petitioners
Docket No.
Year(s)
Deficiencies
Under Sec. 6653(b)
Paul J. Lahr and
15797-81
1977
$4,534.00
Carol Lahr
1978
3,223.00
Frank Prestipino
and
24569-81
1976
4,955.83
Leana Prestipino
1977
4,182.00
1978
4,744.00
Independent
Electric
12419-82
FYE 3/31/79
219,832.00
Supply,
Incorporated
FYE 3/31/80
259,205.00
Hildegard K.
Marks
24550-83
1979
5,024.00
1980
11,100.00
Jean D.
Littlefield
31078-83
1973
1,560.53
$780.27
1974
1,257.51
628.76
1975
2,458.00
1,229.00
1976
1,295.00
648.00
1977
3,532.00
1,766.00
1978
2,776.00
1,388.00
1979
5,468.00
2,734.00
1980
1,455.00
728.00
1981
537.00
268.00
The issues are (1) whether petitioners are entitled to deduct *201 various losses in connection with their investments in certain limited partnerships and trusts, and (2) whether petitioner Littlefield is liable for additions to her 1973 through 1981 Federa income taxes due to fraud. [3]
FINDINGS OF FACT Some of the facts are stipulated and found accordingly. Petitioner Independent Electric Supply, Inc. had its principal place of business in San Carlos, Calif., when its petition was filed herein. All other petitioners resided in California when they filed their petitions herein. The partnerships and trusts.
In 1976 Fred F. Solomon, Jr. (Solomon) and George G. Nicoladze (Nicoladze) devised a plan for the acquisition and syndication of various *202 patents. At the time Solomon was employed as a tax-deferred annuity salesman and Nicoladze was in the business of providing tax and financial planning services. Their initial syndication plan called for the acquisition of patents to various inventions and then the syndication of those patents through the vehicle of a limited partnership, with a separate limited partnership being organized for each patent. In order to assist them in the acquisition of patents, Solomon and Nicoladze contacted Robert Winkler (Winkler) who was the president of Alpha Nova Development Company and Alpha Nova Engineering Company (herein collectively referred to as the Alpha Nova companies). The Alpha Nova companies were primarily engaged in the business of assisting inventors in acquiring patents for their inventions and then representing them in negotiations for the development, sale, or licensing of those patents. Solomon and Nicoladze informed Winkler that, due to changes in the tax law which were to become effective in 1977, [4] it was important that they acquire as many patents as possible before the end of the 1976. Consequently, Solomon and Nicoladze engaged in hasty negotiations with Winkler for *203 the acquisition of several patents. At that point in time neither Winkler nor the Alpha Nova companies had ever sold or licensed a patent for any of the inventors they were representing. *204 These negotiations with Winkler generally proceeded in the following manner. First, Winkler would send Solomon several patents to review. After making his selections, Solomon would send Winkler a standard contract already signed by Solomon and containing the terms of purchase. Winkler would review the contract with the inventor who would then sign the contract and return it to Winkler. Winkler would then forward the completed contract to Solomon. [5]
The stated purchase price for this initial group of patents ranged from $500,000 to $20,000,000, with the majority of the patents having a stated purchase price of $2,003,000. These purchase prices were set unilaterally by Solomon and Nicoladze and far exceeded any offers the inventors had ever received for their patents. Solomon agreed to make downpayments ranging from $3,000 to $100,000, and to pay the balance of *205 the purchase prices with nonrecourse notes ranging in the principal amounts of $497,000 to $19,900,000. The nonrecourse notes were payable out of 50 percent of any future royalties earned from the patents, except that in the event the note was not paid within two or three years of the patent's date of expiration, one-half of the balance would be due immediately and the remaining balance would be due during the year of the patent's expiration. As part of their syndication plan, Solomon had limited partnership agreements prepared for each of the patents which he had either acquired or intended to acquire. These partnership agreements were virtually identical in form with the exception of the partnership name, the names of the limited partners, the particular patent acquired, and the dollar amounts involved. Once the patents were acquired and then assigned to the limited partnerships, Solomon and Nicoladze proceeded to look for investors. Solomon and Nicoladze presented their syndication plan to prospective investors during various seminars and meetings conducted by Solomon. Nicoladze was introduced at these meetings and seminars as a tax expert and explained the purported tax consequences *206 of the proposed syndications. Prospective investors were provided with copies of tax loss projections but were not provided with any significant information regarding the economic viability of the syndication projects. More specifically, the partnerships for which Solomon and Nicoladze acquired investors, the patents acquired for those partnerships, and the purchase prices of the patents, were as follows: Total
Cash
Nonrecourse
Purchase
Partnership
Patent
Payment
Obligation
Price
Aqua Pedic Chair,
Water Filled
$3,000
$2,000,000
$2,003,000
Ltd.
Orthopedic Chair
Aqua Turbo
Energy Saving
100,000
19,900,000
20,000,000
Disposal, Ltd.
Garbage Disposal
Ball Drive
Ball Drive
Support, Ltd.
Mechanism
3,000
2,000,000
2,003,000
Beverage Caddy,
Golf Bag
Ltd.
Supported Beverage
5,000
2,000,000
2,005,000
Can Holding
Assembly
Bite Lite, Ltd.
Fishing Rod
3,000
2,000,000
2,003,000
Signaling Device
Blackjack
Blackjack
Device, Ltd.
Training Device
3,000
2,000,000
2,003,000
Closure Cap, Ltd.
Closure Cap
3,000
2,000,000
2,003,000
Collapsible
Power Drawn
3,000
2,000,000
2,003,000
Trailer, Ltd.
Collapsible Trailer
Comb & Hair
Combined Comb &
3,000
2,000,000
2,003,000
Roller, Ltd.
Hair Roller Device
Crochet Dispenser,
Crochet Needle
3,000
2,000,000
2,003,000
Ltd.
Storage &
Dispensing Device
Exercise Wheel,
Wheel-Type
5,000
3,000,000
3,005,000
Ltd.
Exercise Device
Fishing Line
Outrigger Fishing
3,000
2,000,000
2,003,000
System, Ltd.
Line System With
Line
Flower Pot, Ltd.
Flower Pot
3,000
2,000,000
2,003,000
Fluorescent Table
Fluorescent Table
Tennis, Ltd.
Tennis Assembly
3,000
2,000,000
2,003,000
Golf Tee, Ltd.
Disintegrating
Golf Tee
3,000
2,000,000
2,003,000
Make-Up Guard,
Make-Up Guard
3,000
2,000,000
2,003,000
Ltd.
Medicant Dispenser,
Disposable Food
5,000
7,000,000
7,005,000
Ltd.
Tray & Closure
Member
Needlepoint
Adjustable Needle,
3,000
2,000,000
2,003,000
Frame, Ltd.
Point Holding Frame
Poster Frame Co.
Poster Frame
3,000
497,000
500,000
Power Driven
Power Driven
Shaver, Ltd.
Shaver
30,000
9,000,000
9,030,000
Putting
Putting
Trainer, Ltd.
Trainer
3,000
2,000,000
2,003,000
Sauna Razor,
Face Wetter
Ltd.
For Shaving
3,000
2,000,000
2,003,000
Shampoo Unit,
Sink Shampoo
Ltd.
Unit
3,000
2,000,000
2,003,000
Spike & Cleat
Spike & Cleat
Guard, Ltd.
Guard
3,000
2,000,000
2,003,000
Window Heat
Combination
Retention,
Valance &
7,500
2,000,000
2,007,500
Ltd.
Conditioned Air
Admission Duct
Work Clamp,
Work Clamp
3,000
2,000,000
2,003,000
Ltd.
Zipper Repair
Pliers With
3,000
2,000,000
2,003,000
Tool, Ltd.
Zipper Reforming
Jaws
*207 The funds contributed by the investors to the limited partnerships were paid to Solomon as the general partner of the partnerships. Out of those funds Solomon was reimbursed for downpayments he had made to acquire the patents and for other related expenses, and approximately 4 percent of the funds were paid to Nicoladze as consideration for the services he performed in connection with the syndication plan. The balance of the funds was paid to Cromwell Financial Services Corporation (herein the Cromwell corporation), a corporation organized by Solomon in 1977 ostensibly to oversee the marketing and development of the patents. Solomon was an employee and the sole shareholder of Cromwell. In 1978 Solomon and Nicoladze also began syndicating patents by setting up trusts and then selling beneficial interests in the trusts to investors. [6] Despite this change in form, the syndications continued to be organized, promoted, and operated in essentially the same manner as the limited partnership syndications. Patents were acquired at prices which were effectively set unilaterally by Solomon and Nicoladze, the purchase prices were payable with minimal cash downpayments and large nonrecourse *208 notes, the notes were payable out of a percentage of future royalties with one-half of any outstanding balance becoming due two or three years prior to the expiration date of the patent and the remaining balance becoming due in the year of the patent's expiration, a separate trust was formed for each patent, and investors were acquired through promotional activities wherein projected tax losses were emphasized and the economics of the arrangements were effectively ignored. More specifically, the trusts formed, the patents acquired for the trusts, and the purchase prices of the patents, were as follows: Total
Nonrecourse
Purchase
Trust
Patent
Obligation
Price
Apparatus for
Apparatus for
$19,960,000
$20,000,000
Sterlizing Meat
Sterlizing Meat
Products Trust
Products & Method
for Using Same
Automated Irrigation
Automated Irrigation
24,950,000
25,000,000
System Trust
System
Collapsible Luggage
Collapsible Luggage
2,495,000
2,500,000
Handcart Trust
Handcart
Generator Trust
AC Synchronized
250,000,000
250,000,000
Generator
Energy Generating &
Storing Assembly For
Marine Structure
Geothermal Turbine
Turbine
149,700,000
150,000,000
Patent Trust
Gyroscopic Wheel
Wheel Attached
49,900,000
50,000,000
Trust
Balancing Device
Hair Curling Iron
Hair Curling Iron
6,000,000
6,000,000
& Oven Trust
& Oven
Haymaker & Hay
Haycuber
5,995,000
6,000,000
Cubing Assembly
Trust
Medicant Dispensing
Timed Medicant Dispensing
2,000,000
2,003,000
Trust
Device
Pivotal Structure
18,000,000
18,003,000
Pocket Supportable
Pocket Supportable
2,000,000
2,000,000
Atomizer Device
Atomizer Device
Trust
Water Heater
10,749,000
10,800,000
Control Trust
Wind Indicator Trust
1,000,000
1,000,000
High Torque Wrench
High Torque Wrench
49,950,000
50,000,000
Trust
Assembly
*209 Nicoladze was named as the trustee of each of these trusts. In 1979, apparently due to Solomon's precarious financial situation which eventually led to his filing for bankruptcy, Solomon and Nicoladze caused the limited partnerships to be liquidated and the patents to be transferred to corresponding trusts. The limited partners thereby became beneficiaries of the trusts and Nicoladze was named as the trustee of the trusts. The partnerships and the corresponding trusts were as follows: Limited Partnerships
Corresponding Trust
Aqua Pedic Chair, Ltd.
Chair Trust
Aqua Turbo Disposal, Ltd.
Aqua Turbo Trust
Ball Drive Support, Ltd.
Ball Drive Trust
Beverage Caddy, Ltd.
Caddy Trust
Bite Lite, Ltd.
Bite Lite Trust
Black Jack Device, Ltd.
Black Jack Trust
Closure Cap, Ltd.
Cap Trust
Collapsible Trailer, Ltd.
Collapsible Trailer Trust
Comb & Hair Roller, Ltd.
Roller Trust
Crochet Dispenser
Dispenser Trust
Exercise Wheel, Ltd.
Wheel Trust
Flower Pot, Ltd.
Flower Pot Trust
Fluorescent Table Tennis, Ltd.
Table Tennis Trust
Geothermal Turbine, Ltd.
Geothermal Turbine Trust
Golf Tee, Ltd.
Golf Tee Trust
Make-Up Guard, Ltd.
Make-Up Guard Trust
Mark-R-Tape, Ltd.
Shopping Cart Trust
Medicant Dispenser, Ltd.
Food Tray Trust
Needlepoint Frame, Ltd.
Frame Trust
Poster Frame Co.
Poster Trust
Power Driven Shaver, Ltd.
Shaver Trust
Putting Trainer, Ltd.
Putting Trainer Trust
Sauna Razor, Ltd.
Razor Trust
Shampoo Unit, Ltd.
Shampoo Unit Trust
Spike & Cleat Guard, Ltd.
Cleat Guard Trust
Window Heat Retention, Ltd.
Window Trust
Work Clamp, Ltd.
Clamp Trust
Zipper Repair Tool, Ltd.
Zipper Trust
*210 Concurrent with the transfer of the patents to the trusts, Solomon and the inventors renegotiated the terms of payment for the patents. New promissory notes were issued to the inventors which extended the payment dates, but the notes continued to be nonrecourse. Additionally, several of the trusts and inventors entered into "cross-collateralization" agreements which were intended to permit any income generated from one patent to be used to discharge the notes secured by other patents. Otherwise, despite the change in form from limited partnerships to trusts, no significant changes were made in the arrangements and operations which already existed in connection with the marketing and development of the patents. Once the patents had been acquired and investors had been found for the various limited partnerships and trusts, Solomon engaged in the following development and marketing activities. First he hired Winkler and his Alpha Nova companies to develop prototypes for many of the patents, initially agreeing to pay $10,000 per patent and then subsequently agreeing to pay $20,000 per patent. Next, Plog Research, Inc. (herein the Plog company), was hired to do research and marketing *211 reports on the patents (herein the Plog reports), at prices ranging from $1,800 to $3,000 per report. Finally, he hired Tom Tanner to market the patents, initially agreeing to pay Tanner $10,000 per patent in connection with his marketing efforts and then subsequently agreeing to pay him $15,000 per patent. The Plog reports were intended to assist in the promotion and marketing of the patents and included a sales projection for each patent studied. Generally they were prepared only after Solomon had already acquired the patents. When a report contained a sales projection which was unacceptable to Solomon, the Plog company would revise its report to include a higher projection. Ht Plog company was informed by a representative of the Solomon organization that a gross sales ratio of $60,000,000 per every $1,000,000 in patent costs would generally constitute an "acceptable" projection. Even after several of the patents had been acquired and the corresponding partnerships and trusts had been formed, Solomon spent the majority of his time marketing investment units in new patents rather than developing previously acquired patents. He then used funds contributed by new investors to *212 new partnerships and trusts to pay expenses incurred in connection with the development and marketing of previously acquired patents. Investors' funds were also used to provide Solomon with relatively plush offices, to cover the $60,000 per year salary Solomon paid to an attorney he retained for his organization, and to cover the $80,000 per year salary Solomon paid to a "general manager." By the end of 1977 Winkler and Tanner had not made any significant progress towards the development and marketing of the patents, yet Solomon did not terminate his relationship with them until the spring of 1978 and the spring of 1979, respectively. Although in the meantime Solomon did make minor personnel changes, including the hiring of Thomas Perkins to act as a liaison between the organization and Winkler, Tanner, and the Plog company, these changes only served to aggravate communication and organization problems which already existed. Eventually, Solomon hired Sales Promotion Services, Inc., to take over the development of prototypes for most of the patents, but no significant progress was ever made by Sales Promotion Services, Inc., either. Due to his personal financial difficulties, *213 in 1981 Solomon assigned all of his interests in the patents and trusts to Khartli, Inc. (Khartli), a California corporation. Khartli also thereby assumed primary responsibility over the development and exploitation of the patents.Petitioner Hildegard Marks (Marks) was the sole shareholder of the corporation and Harold DeJulio (DeJulio) served as its president. Solomon had met DeJulio through Nicoladze in 1978 and thereafter DeJulio began assisting Solomon in obtaining investors for the trusts and partnerships. Marks worked as a secaretary of both Nicoladze and DeJulio and, as the Treasurer of Khartli, also informed investors on how to prepare their income tax returns in connection with their investments in the various trusts. Khartli did not bring about any significant changes in the operations of the various patent activities. The partnerships and trusts at issue herein have not earned any income from the sale, licensing, or other exploitation of the patents, including those for which prototypes have been developed. Instead, during the years in issue, these same partnerships and trusts reported aggregate losses in excess of $90,000,000. As a result of their involvement in *214 the above matters, in 1983 Solomon and Nicoladze were both convicted of (1) conspiracy to defraud the United States in violation of 18 U.S.C. 371, (2) subscribing false returns in violation of 26 U.S.C. 7206(1), and (3) assisting in the preparation of false returns in violation of 26 U.S.C. 7206(2). Petitioners' involvement in the partnerships and trusts.
Petitioners were investors in the Solomon group. Their contributions to the partnerships and trusts, and their projected tax losses from such investments, were as follows: Petitioner's
Petitioners/Entities
Contribution
Year of Contribution
Projected Tax Loss
Lahr
Bite Lite, Ltd.
$4,000   1977
$103,925
Make-Up Guard, Ltd.
3,000   1977
91,115
Prestipino
Sauna Razor, Ltd.
5,000   1976
186,682
Independent Electric
Supply, Inc.
Apparatus for
110,000   1979
3,951,139
Sterilizing
Meat Products Trust
Geothermal Turbine
64,000   1979
2,970,000
Patent Trust
Marks
Gyroscopic Wheel Trust
8,000   1979
308,332
Generator Trust
1980
625,058
Littlefield
Beverage Caddy, Ltd.
198   1976
44,427
Closure Cap, Ltd.
198   1976
616,566
Aqua Pedic Chair,
31.65
1977
341,820
Ltd.
Make-Up Guard, Ltd.
6   1976
18,223
Ball Drive Support,
31.65
1977
393,660
Ltd.
Crochet Dispenser,
31.65
1977
389,670
Ltd.
Golf Tee, Ltd.
31.65
1977
415,700
Zipper Repair Tool,
120.00
1977
94,885
Ltd.
Poster Frame Co.
3,373   1976
100,000
Haycuber & Hay
4,000   1979
118,920
Cubing
Assembly Trust
*215 In addition to her status as a limited partner in and beneficiary of certain of the partnerships and trusts, petitioner Jean D. Littlefield (Littlefield) also worked as a secretary and administrative assistant for Solomon in connection with his patent syndication activities. Her duties included ordinary secretarial and bookkeeping services, opening of partnership and trust bank accounts, filing of fictitious business name statements and certificates of limited partnership, issuance of checks as a signatory of partnership, trust, and the Cromwell corporation bank accounts, and the rendering of general administrative duties in connection with the promotional seminars conducted by Solomon. Having formed J.D. Littlefield Service Corporation in 1975 primarily for the purposes of contracting out such services, she was paid for these services by that corporation. In 1983, based on her involvement in the Solomon organization, Littlefield was convicted of conspiracy to defraud the United States in violation of 18 U.S.C. 371. On their returns for the years in issue, petitioners claimed losses with respect to their interests in the various partnerships and trusts *216 as follows: Petitioners/Entity
1976
1977
1978
1979
1980
1981
Lahr
Bite Lite, Ltd.
$10,475
$6,674
Make-Up Guard, Ltd.
8,681
5,891
Prestipino
Sauna Razor, Ltd.
$15,005
15,608
15,607
Independent Electric
Supply, Inc.
Apparatus for Sterilizing
$236,857
$285,714
Meat Products Trust
Geothermal Turbine
Patent Trust
270,000
180,000
Marks
Gyroscopic Wheel Trust
14,706
26,470
Generator Trust
3,584
44,647
Littlefield
Beverage Caddy, Ltd.
23,158
Closure Cap, Ltd.
23,020
Make-Up Guard, Ltd.
589
Aqua Pedic Chair, Ltd.
5,892
Ball Drive Support, Ltd.
7,822
Crochet Dispenser, Ltd.
6,260
Golf Tee, Ltd.
6,677
Zipper Repair Tool, Ltd.
10,016
7,382
Poster Frame Co.
5,856
Zipper Trust
5,007
5,007
5,007
Haycuber & Hay Cubing
Assembly Trust
8,000
8,000
8,000
Poster Trust
5,882
5,882
5,882
These losses were attributable to deductions for depreciation, business expenses, and research and development expenses claimed by the partnerships and trusts in connection with the patents. In his notices of deficiency, respondent determined that the partnerships *217 and trusts were not entitled to take these deductions because they were not engaged in a business nor in any other activity for profit. Respondent also disallowed the losses on several alternative grounds. Additionally, respondent determined that petitioner Littlefield was liable for additions to tax for fraud for each of the years in issue. OPINION At issue in this case are deductions claimed by petitioners as a result of their respective interests as limited partners and beneficiaries in the above partnerships and trusts. Respondent seeks to disallow these deductions on several grounds. We will first address the question of whether the partnership and trust activities were engaged in for profit. The relevant partnership and trust deductions for the years in issue consisted of deductions for depreciation under section 167(a), ordinary and necessary business expenses under section 162(a), and research and development expenses under section 174(a). Section 167(a) provides a deduction for the exhaustion of (1) property used in a trade or business, or (2) property held for the production *218 of income. The carrying on of a trade or business is also a prerequisite to deductibility under section 162(a). Thus, absent a trade or business, neither the partnerships nor the trusts herein will be entitled to deductions pursuant to either section 162(a) or section 167(a). [7]Although under section 174(a) the research and development expenses only need to be incurred "in connection with" a trade or business rather that "in carrying on" a trade or business, see Snow v. Commissioner,416 U.S. 500 (1974), the determination as to whether a trade or business exists must be made thereunder as well. An activity does not constitute a trade or business unless it is engaged *219 in with the predominant purpose and intention of making a profit, i.e., taxable income, therefrom. Hirsch v. Commissioner,315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Flowers v. Commissioner,80 T.C. 914, 931 (1983); Siegel v. Commissioner,78 T.C. 659, 698 (1982). Although it is not necessary that the profitmaking expectations be reasonable, the profit objective must be in good faith. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C.Cir. 1983); Allen v. Commissioner,72 T.C. 28, 33 (1979). The determination of whether the requisite intention exists is one of fact to be resolved on the basis of all the facts and circumstances. Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). The burden of proof is on petitioners, see Rule 142(a), Tax Court Rules of Practice and Procedure, and greater weight *220 must be placed on objective facts rather than upon mere statements of intent. Sec. 1.183-2(a), Income Tax Regs.; Churchman v. Commissioner,68 T.C. 696, 701 (1977). On brief the parties have agreed that whether the activities of the relevant partnerships were engaged in with the predominant purpose and intention of making a profit must be determined at the partnership level. See Brannen v. Commissioner,78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). With respect to the activities of the relevant trusts, however, petitioners contend that such analysis must be made with respect to each individual beneficiary. Our view of the case is that the investments in and activities of the relevant trusts and partnerships were so overwhelmingly motivated by tax considerations rather than profit objectives that it makes no difference in the instant case what level such analysis is made. From either standpoint we conclude on the basis of the record before us that none of the relevant activities were engaged in with the requisite profit motive. First, we think it is beyond question that the purchase *221 prices for all of the patents in issue were grossly inflated. The purchase prices ranged from $500,000 to $250,000,000 and, except for relatively insubstantial downpayments of cash, were payable with nonrecourse indebtedness. Incredibly, these large purchase prices were not set after extensive rounds of bargaining with the patentholders but instead were effectively set unilaterally by Solomon and Nicoladze and far exceeded anything the inventors had ever been offered for their inventions before. [8] Moreover, the patents were acquired without first making any serious investigation into their marketability. Although petitioners have attempted to prove the claimed values of five of the patents through the submission of certain "market potential" reports, these reports are extremely simplistic and wholly unconvincing. They merely assume that market penetration will be achieved at a certain level without discussing in any meaningful way the ordinary risks inherent in the development, manufacturing, and marketing of a product. *222 When, as here, a purchase price is grossly inflated by means of nonrecourse indebtedness, serious doubts are raised about whether the activity with respect to which the property was acquired was entered into for profit. Flowers v. Commissioner,80 T.C. 914, 937 (1983). In buying the patents at inflated prices in the instant case, the partnerships and trusts were immediately placed at a tremendous disadvantage in that to make a profit the patents had to generate revenues far in excess of what they could feasibly produce. Brannen v. Commissioner,supra.Thus, the inflated nonrecourse indebtedness which was used to acquire each of the patents herein provides strong evidence that the activities of the partnerships and trusts were not engaged in for profit but instead were entered into to reduce taxes by generating large depreciation deductions attributable to the inflated basis. Flowers v. Commissioner,supra.
The record also contains ample other evidence that the patent activities were not engaged in for profit. For instance, *223 in marketing the limited partnerships and trusts to prospective investors, including the petitioners herein, the projected tax benefits of their investments were emphasized and little or no substantive information was provided regarding the economic viability of the activities. Although the Plog reports contained estimates of potential revenue from many of the patents and were apparently made available to prospective investors, these estimates "border on fantasy." Flowers v. Commissioner,supra at 940. In this regard, we find that the following point made under similar circumstances in Flowers v. Commissioner,supra, is equally applicable here: It is clear to us that the petitioners failed to make a bona fide effort to investigate the facts surrounding the then-proposed transaction. At some point, naivete becomes a purposeful refusal to analyze the facts, perhaps due to the expectation that the tax benefits, alone, will justify the investment. [Flowers v. Commissioner,supra at 940.] Additional factors to be considered *224 in determining whether the patent activities were engaged in for profit are listed in section 1.183-2(b), [9] Income Tax Regs., as follows: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Consideration of these factors in the instant case certainly provides further support for the conclusion that the relevant patent activities were not engaged in for profit. Particularly noteworthy is the fact that no profits have *225 been realized by any of the partnerships and trusts at issue herein nor is there any indication in the record that such profits are ever likely to occur. Instead, these partnerships and trusts have a history of losses which in the aggregate exceed $90,000,000. This record of such large losses over so many years is certainly persuasive evidence that none of the parties involved in the patent activities intended to make a profit therefrom. See Brannen v. Commissioner,78 T.C. 471, 512 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Nor is it plausible that any of the parties intended to make a profit from any potential appreciation in the value of the patents. As discussed above, the purchase prices of the patents were grossly inflated and thereby effectively precluded the possibility that the values of the patents would increase beyond what was paid for them. Moreover, since the patents were due to expire in seventeen years, it was far more likely that the patents would decline rather than increase in value. Finally, it is apparent from the record that the patent activities of the partnerships and trusts were not operated in a businesslike manner. *226 Solomon and Nicoladze were primarily responsible for overseeing the development and marketing of the patents yet their expertise was in the area of tax and financial planning rather than in the area of patent development. Despite this lack of expertise, they acquired patents on behalf of the trusts and partnerships without obtaining any significant outside assistance in evaluating the patents. Then, rather than focusing their efforts toward the development and marketing of the patents, the majority of their time was directed toward the promotion of new patent syndications. Although Solomon and Nicoladze did contract out most of the development and marketing work to third parties, the lack of supervision they maintained over these essential activities is nevertheless glaring. For instance, fixed payments were made to Winkler and Tanner for development and marketing of many of the patents without any regard for what it would actually cost to successfully develop or market them. Then, even though it was apparent by the end of 1977 that Winkler and Tanner were not making any significant progress in either the development or marketing of the patents, Solomon did not terminate his *227 relationship with them for several months. In the meantime, money was squandered on relatively plush offices, excessive salaries were paid, and money invested in some of the newer syndications was used to pay expenses incurred by some of the older partnerships. In short, the record is replete with examples of unbusinesslike conduct on the part of the key people involved in these patent activities. Although certain changes were eventually made by Solomon and Nicoladze, there is no indication that these changes were made in a good faith effort to make the partnerships and trusts profitable. For instance, although Solomon eventually fired Tanner and Winkler and then hired Sales Promotion Services, Inc. to take over the development of the patents, no significant progress was ever made by Sales Promotion Services, Inc. either. Similarly, although some of the later patent syndications were accomplished through the formation of trusts, this change in form was not accompanied by any substantive changes in the conduct or operation of the patent activities. In conclusion, based on the entire record, and in view of the fact that the promised tax benefits were so suspiciously excessive *228 and that the relevant transactions were entered into and carried out with such a complete indifference to profit, we believe that if "anything can be described as an 'abusive tax shelter,' this is it." See Flowers v. Commissioner,80 T.C. 914, 941 (1983). Accordingly, we hold that the patent activities at issue herein were not entered into with the requisite profit motive and, thus, that all the deductions at issue must be disallowed. [10]
Fraud issue.
The only remaining issue in this case is whether for each of the years in issue petitioner Littlefield is liable for an addition to tax for fraud under section 6653(b). In order to resolve this issue, we must first address respondent's contention that the 1983 conviction of Littlefield for conspiracy to defraud the United States in violation of 18 U.S.C. 371 collaterally estops her from denying that a part of each of her underpayments *229 herein was due to fraud. The general rule regarding the application of the doctrine of collateral estoppel to tax litigation is set forth in Commissioner v. Sunnen,333 U.S. 591 (1948), wherein the Supreme Court stated that "where a question of fact essential to the judgment is actually litigated in the first tax proceeding, the parties are bound by that determination even though the cause of action is different." To this general rule it must be added that in order for the estoppel to apply to establish a fact in question, determination of that fact must have been necessary or essential to the result in the first suit. See Amos v. Commissioner,43 T.C. 50, 54 (1964), affd. 360 F.2d 358 (4th Cir. 1965). Since we have already concluded above that Littlefield did underpay her taxes, the only remaining fact in question is whether she made any part of each underpayment with the specific intention of evading taxes. See McGee v. Commissioner,61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). Thus, *230 whether the doctrine of collateral estoppel applies here depends on whether the conviction of Littlefield for conspiracy to defraud the United States established the existence of that fraudulent intention. The conviction of Littlefield under 18 U.S.C. 371 was made by a general jury verdict. In order to convict a person thereunder, the jury was instructed by the court that the following elements had to have been established: (1) that two or more persons came to a mutual understanding to try to accomplish a common and unlawful plan as charged in the indictment; (2) that the accused willfully became a member of the conspiracy with the intent of furthering the object or purpose of the conspiracy charged; (3) that one of the conspirators thereafter committed at least one of the overt acts charged in the indictment; and (4) that such overt act was knowingly done in furtherance of some object or purpose of the conspiracy as charged. The court also instructed the jury that the accused only had to have the "intent to advance or further some object or purpose of the conspiracy" [emphasis added], that the accused only had to agree to defraud the United States *231 by "willfully creating a false document or documents, or by other means, upon which improper deductions substantially affecting the income taxes of themselves or others were based" [emphasis added], that is not necessary that the accused "had been a member of the conspiracy for the entire period of its existence," and that "even if [the accused] participated in [the] conspiracy to a degree more limited that that of a co-conspirator, he is equally guilty so long as he was in fact a conspirator." In essence, the indictment charges that the object of the conspiracy was to defraud the United States by causing taxpayers to take improper deductions on their income tax returns through the acquisition and syndication of various patents. Of the 65 alleged overt acts alleged in the indictment to have been committed in furtherance of the conspiracy, many are unrelated to the specific partnerships and trusts from which Littlefield's losses herein were derived. For instance, although several of the alleged overt acts involve the acquisition of the geothermal turbine patent and the formation of the corresponding trust, Littlefield was not an investor in the geothermal patent trust and *232 none of her underpayments herein are attributable to that trust. Accordingly, in light of the wide-reaching charges set forth in the indictment (many of which are not directly related to the losses claimed by Littlefield herein), the fact that the jury was instructed to convict Littlefield under 18 U.S.C. 371 even if she agreed to advance only one of the purposes of the conspiracy, and the fact that the conviction of Littlefield thereunder was made by a general jury verdict, it is impossible to determine whether the jury established that Littlefield knew that the losses claimed by any of the partnerships and trusts in which she invested were false. Instead, the jury may have simply determined, for instance, that the only time Littlefield became involved in the conspiracy was when she assisted in the syndication of the geothermal turbine patent. Significantly, a determination that she knew the deductions taken by the geothermal turbine patent trust were false does not thereby establish that she also knew the deductions taken by those partnerships and trusts in which she did invest were also false. Consequently, as a result of this inability to determine the *233 specific basis on which the jury reached its verdict against Littlefield, we hold that under these particular circumstances the conviction under 18 U.S.C. 371 does not collaterally estop Littlefield from challenging the additions to tax for fraud asserted against her herein. Cf. Amos v. Commissioner,43 T.C. 50 (1964), affd. 360 F.2d 358 (4th Cir. 1965). In the alternative, respondent contends that, regardless of whether Littlefield is collaterally estopped from challenging the additions to tax for fraud, the record herein nevertheless establishes that the relevant underpayments were fraudulent. For purposes of section 6653(b), fraud is an intentional wrongdoing with the specific intent to evade a tax believed to be owed. McGee v. Commissioner,61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975); Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968). The existence *234 of fraud is a question of fact to be determined from the entire record. Grosshandler v. Commissioner,75 T.C. 1, 19 (1980). The burden is on respondent to prove fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). Because direct proof of fraudulent intent is seldom possible, respondent may show the requisite intent from the conduct of the taxpayer and the surrounding circumstances. Grosshandler v. Commissioner,supra.
Although it is clear that in her role as a secretary and administrative assistant Littlefield was involved in virtually every aspect of Solomon's patent syndication schemes, based on the record before us we conclude that respondent has not sustained his burden of proving that she knew the losses she claimed from the partnerships and trusts at issue were fraudulent. Apart from her status as an investor Littlefield's role in these partnerships and trusts was subordinate to Solomon and Nicoladze, and the record indicates that the actions she took in connection with those syndications were done solely under their direction. Although the existence of such a subordinate role does not necessarily preclude a finding *235 that she nevertheless knew that the partnerships and trusts in which she invested constituted tax-evasion schemes, in this regard we think it is significant that Littlefield did not possess any expertise in either tax or financial matters which might have caused her to be more skeptical of the promised tax benefits. Moreover, it is obvious that both Solomon and Nicoladze were very skillful salesmen who convinced hundreds of taxpayers like Littlefield that the tax benefits offered by their various patent schemes were legitimate. With respect to the partnerships and trusts at issue herein, respondent has simply not sustained his burden of proving that Littlefield was anything bur another victim of the Solomon and Nicoladze sales pitch. In conclusion, we recognize that the conviction of Littlefield for conspiracy indicates that at some point Littlefield did know that at least one of the partnerships or trusts organized by Solomon and Nicoladze was taking improper deductions. As discussed above, however, this does not thereby establish that she knew the partnerships and trusts in which she did invest were also taking improper deductions. Although it certainly raises a suspicion that *236 at some point she may have had such knowledge, we do not believe that suspicion is enough to sustain respondent's burden of proof on the issue of fraud herein. See Thurston v. Commissioner,28 T.C. 350, 355 (1957). Instead, this issue of fraud must be decided on the basis of the record before us, and on that basis we find that respondent has not sustained his burden of proving in a clear and convincing manner that Littlefield knew the deductions taken by the partnerships and trusts in which she invested were false. Accordingly, for the above reasons, we conclude that Littlefield is not liable for additions to tax for fraud for the years in issue. [11]
*237 To reflect the foregoing, Decision in docket No. 31078-83 will be entered under Rule 155 and all other decisions will be entered for respondent.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Frank Prestipino and Leana Prestipino, docket No. 24569-81; Independent Electric Supply, Incorporated, docket No. 12419-82; Hildegard K. Marks, docket No. 24550-83; and Jean D. Littlefield, docket No. 31078-83.↩
2. All section references are to the Internal Revenue Code of 1954, as amended. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. The parties herein agree that our determination of the first issue will also resolve whether petitioner Littlefield is entitled to net operating loss carrybacks and carryovers to her 1973 through 1975 and 1978 through 1981 taxable years and will also resolve whether she is liable for the self-employment tax for her 1977 taxable year.↩
4. For tax years beginning after December 31, 1976, and before January 1, 1979, sec. 704(d) provided: (d) Limitation on Allowance of Losses.--A partner's distributive share of partnership loss (including capital loss) shall be allowed only to the extent of the adjusted basis of such partner's interest in the partnership at the end of the partnership year in which such loss occurred. Any excess of such loss over such basis shall be allowed as a deduction at the end of the partnership year in which such excess is repaid to the partnership. For purposes of this subsection, the adjusted basis of any partner's interest in the partnership shall not include any portion of any partnership liability with respect to which the partner has no personal liability. The preceding sentence shall not apply with respect to any activity to the extent that section 465 (relating to limiting deductions to amounts at risk in case of certain activities) applies, nor shall it apply to any partnership the principal activity of which is investing in real property (other than mineral property).↩
5. Although most of the patents involved in this case were acquired through Winkler, some of them were not so acquired but instead were acquired directly from the inventors. Nevertheless, these negotiations were also conducted in a perfunctory manner and the form of the transactions were effectively the same.↩
6. The haycuber patent, the haycuber assembly patent, and the apparatus for sterilizing meat products patent, were formally acquired, respectively, by Khartli, Inc. and Colki, Inc., both California corporations, see text, infra,↩ before they were transferred to their corresponding trusts. Nevertheless, it is clear from the record that Solomon and Nicoladze were inextricably involved in the acquisition of these patents and the formation of the corresponding trusts.
7. Neither the partnerships nor the petitioners claimed deductions under sec. 212 on their returns, and no claim has been made by petitioners that the deductions are for anything other than trade or business expenses.↩
8. Although the haycuber patent, the haycuber assembly patent, and the apparatus for sterilizing meat products patent, were originally purchased by Khartli, Inc. and Colkhi, Inc., respectively, before being transferred to the corresponding trusts, it is clear from the record that Solomon and Nicoladze were inextricably involved in the acquisition of these patents and the formation of these trusts. See n. 6, supra.↩ Consequently, any conclusions we reach with respect to the conduct of Solomon and Nicoladze in connection with the various patent syndications is equally applicable to these patents and trusts.
9. The regulations expressly state that sec. 183 is applicable to trusts. Sec. 1.183-1(a), Income Tax Regs.↩
10. Since the partnerships and trusts at issue herein had no income during the years in issue, sec. 183(b)(2) is not applicable. See Brannen v. Commissioner,78 T.C. 471, 500 (1982), affd. 722 F.2d 695↩ (11th Cir. 1984).
11. Pursuant to an amendment to his answer filed on March 14, 1984, respondent argued that Littlefield's interests in certain of the above partnerships were received as compensation for services rendered.However, with respect to this new matter respondent has failed to sustain his burden of proving that under the circumstances of this case, see text, supra, her partnership interests had any value or, even if they did, that those values exceeded the amounts she paid for those interests. See Rule 142(a)↩. We also note that the record clearly shows that she received a salary for the services she performed on behalf of the partnerships.