E.A. BRANNEN and Frances K. Brannen, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 82–8541.

United States Court of Appeals, Eleventh Circuit.

Jan. 9, 1984.

696

John E. James, J. Thomas Durden, Macon, Ga., for petitioners-appellants.

Glen L. Archer, Jr., Asst. Atty. Gen., Tax Div., Michael L. Paup, Chief, Appellate Section, Gilbert S. Rothenberg, Ann Belanger Durney, U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before VANCE and CLARK, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

Frances K. and E.A. Brannen, husband and wife, appeal from a decision of the United States Tax Court determining a deficiency in their joint federal income tax in the amount of $6,984.09 for the calendar year 1975. The opinion of the tax court is reported at 78 T.C. 471. We affirm.

## I.  FACTS

Dr. E.A. Brannen ("taxpayer")[1] is a medical doctor by profession. In late February or early March 1974, the taxpayer attended a movie investment presentation at the home of a close friend. At the meeting, Dr. W.L. Ryder, a psychiatrist who represented himself as an investment counselor, gave a presentation regarding the purchase of partnership interests in a New York limited partnership named Britton Properties. Ryder explained that the limited partnership was being formed to purchase a movie called "Beyond the Law." He presented the financial and tax aspects of the investment, and distributed a number of documents, including a law firm's opinion letter. The opinion letter stated, among other things, that the partnership would be respected for federal income tax purposes, that each limited partner's adjusted basis in the partnership would include his share of the nonrecourse partnership liabilities since the debt was a bona fide obligation, and that the seller of the film, Cinema Shares International, Ltd. ("CSIL"), was not related to the general partner or any of the limited partners of the partnership. A statement from Sancrosiap, S.p.A. ("Sancrosiap"), the producer of the movie, was also distributed at the presentation. This document listed the official production costs for the movie as approximately $1,450,000. A certificate from the president of Pictures & Movies Establishment ("P & M"), the seller of the movie to CSIL, stated that the gross earnings of the movie in American dollars was $2,700,000 in Italy and $4,000,000 in the rest of the world, excluding the United States and Canada. At the meeting, Ryder stated that usually the films that are well received abroad are better received in the United States, since it is a larger movie market.

---

1. Although Dr. Brannen and his wife both appeal as taxpayers, appellants will be referred to in the singular as most of the discussion involves Dr. Brannen.

The biographies of Michael Stern, who was to be the general partner of the partnership, Robert M. Fink, author of the tax opinion letter, and Lewis S. Ginsburg, who was the president of Stellar IV Film Corporation, which was the distributor of the movie, were distributed. A circular describing Britton Properties and listing financial projections assuming various stated gross proceeds was also distributed. The circular stated that the purchase price was to consist of a $400,000 capital contribution together with a $1,400,000 nonrecourse nonnegotiable promissory note bearing an interest rate of four percent. In addition, the taxpayer received publicity material including a number of still photographs from the movie and a one-page summary of the plot. The potential investors did not view the movie at the presentation. Aside from the limited partnership agreement which was presented, no other documents were presented at the investment presentation. No written appraisal of the film was circulated or discussed. The success and failures of Michael Stern were not discussed.

The maximum permissible depreciation was discussed at the presentation and the taxpayer noted on one of the documents distributed at the meeting that of the total amount of permissible depreciation, 96 percent would be deductible in the first two years of ownership—85 percent in the first year, and 11 percent in the second year. The taxpayer made this notation on a letter from Eli J. Warach, who was a vice president—managing editor of Prentice-Hall, Inc. The letter, which was dated January 29, 1974, stated that it was the author's conclusion that Britton Properties was "based upon sound and realistic economic practices and principles" and that "this program is built upon a solid economic and tax foundation."

At the meeting, Ryder advised the taxpayer that as a result of his initial $20,000 investment, he would realize tax savings of $43,530 during the first three years. If the $43,530 in tax savings were invested in five-percent tax exempt bonds, the total yield over the next nine years would be $31,900. At the end of twelve years, assuming that the picture was unsuccessful, each investor would be subject to recapture of $33,200 when the $1,400,000 nonrecourse note became due. After netting this recapture tax with the tax exempt income, the taxpayer was advised that he would make $22,000 on his investment of $20,000.

On March 26, 1974, several weeks after the presentation, the taxpayer purchased a 4.95 percent interest in Britton Properties. He signed the amended Limited Partnership Agreement of Britton Properties, which was dated as of January 15, 1974. The agreement stated that the partnership was formed to acquire the United States and Canadian rights to "Beyond the Law" and to distribute the movie by entering into a distribution agreement with Cinema Shares International Distribution Corp. ("CSID"). The agreement stated that the general partner was to manage the partnership business and was to be "the sole representative of the Partnership in all transactions with the third parties...."

In an agreement dated "April ____, 1974," Stern, as general partner of Britton Properties, entered into a purchase agreement for the movie with CSIL. CSIL was represented by its president, Richard Friedberg. Pursuant to the purchase agreement, Britton Properties purchased the movie "Beyond the Law" for the territory which included the United States and Canada, for the sum of $1,730,000 payable $200,000 on or before June 30, 1974, and $130,000 on or before December 31, 1974, such payments to be made in cash, plus the balance evidenced by a nonrecourse note for $1,400,000, together with interest at the rate of four percent per annum on the outstanding balance. The sole collateral for this nonrecourse note was the film itself.

Friedberg, as president of CSIL, had purchased the movie in 1973 from P & M for the sum of $1,491,250, of which $91,250 was to be paid in cash and the balance of $1,400,000 was evidenced by a non-negotiable nonrecourse promissory note which contained the exact terms as the note signed by Britton Properties. In a letter dated

May 10, 1974, P & M stated that the cash portion of the purchase price of the movie was $75,000 so that the total purchase price was $1,475,000 rather than the $1,491,250 as originally agreed upon in the purchase agreement. Although Stern was an officer in CSIL at that time, he did not know the amount of the cash price paid for the film by CSIL. He was aware, however, of the amount of the note executed by CSIL because it was identical to the note the partnership subsequently executed when it purchased the film. Pursuant to a purchase agreement dated July 20, 1973, P & M had purchased the movie from Sancrosiap, the producer, for distribution in the United States and Canada for the sum of $50,000.

In May 1974, Britton Properties and CSID entered into a distribution agreement for the movie, whereby CSID was to receive a cash payment of $50,000, plus a percentage of the gross receipts. Pursuant to the agreement, CSID was obligated to expend $25,000 in the distribution and exploitation of the movie. CSIL had previously entered a distribution agreement with Stellar IV Film Corporation ("Stellar IV"), dated November 12, 1973, which stated that Stellar IV would act as the distributor for the movie until September 30, 1982. This agreement was similar to the agreement between Britton Properties and CSID except that it did not provide for the payment of any cash in advance of the distribution of the movie. In addition, Stellar IV was to expend not less than $50,000 for prints, advertising, and promotion. On July 5, 1974, Stellar IV and World Wide Film Distribution Corp. (World Wide) entered into an agreement whereby World Wide agreed to act as the subdistributor of Stellar IV's pictures.

In May 1974, Britton Properties and Omni Capital Corporation ("Omni") entered into a management agreement in which Britton Properties paid Omni $20,000 cash and Omni agreed to provide general and administrative services. The agreement was signed by Friedberg, as president of Omni.

The movie opened at the Red Raider Drive-In in Lubbock, Texas on July 10, 1974 and played through July 16, 1974. For the months of July through September 1974, the film played in Texas, South Carolina, and North Carolina. There were also twelve "combination showings" in Louisiana, South Carolina, North Carolina, and Mississippi during the period from August through early October. In a letter dated October 1, 1974, Stern stated that Stellar IV, the distributor of the movie, reported four bookings in October, three in November, and two in December. Two more bookings were reported in South Carolina in November and four in California in December. There was a total of fifty-four play dates for 1974 listed on various sheets of paper; however, there was no independent confirmation that the movie in fact played in all of these locations during the stated dates. There was a total of 160 play dates in 1975.

At some time in late 1974 after the poor opening of the film, Stern and Omni became concerned that Stellar IV was not properly distributing the film. They learned that Stellar IV had entered into a subdistribution agreement with World Wide without the approval of CSID and that Stellar IV was generally an undercapitalized company. As a result, the agreement with Stellar IV was terminated and Stern changed distribution affiliation to World Wide. Stern did not inform the limited partners that Stellar IV had previously entered into a subdistribution agreement with World Wide. World Wide continued its distribution of the movie until CSID assumed full distribution on January 1, 1976.

The taxpayer communicated periodically with Stern concerning distribution and promotion, and at his own expense, called several theaters where the movie was supposedly shown. He became concerned about the movie's progress and called and wrote Stern to advise him of discrepancies in distribution. The taxpayer never received a written reply from Stern. In 1977, CSID began to contract with television stations for the movie.

"Beyond the Law" was made in Italy and was known in the trade as a "spaghetti western." The three principal actors spoke English while the balance of the cast was composed of primarily Italian and German actors. In order to prepare this film for the American market, the producers used two separate processes to add English voices. This post-synchronization job was not done well. The editing of the film was also poor. In addition, the film apparently was not protected by a United States copyright.

As of April 1972, Friedberg was the sole shareholder of CSIL. In 1974 Friedberg was the president and Stern was the vice president of CSID, CSIL, and Omni. In addition, Stern was paid by CSIL. Stern did not have an ownership interest until 1976 or 1977 when he acquired a 20 percent ownership interest in CSID. The companies were all located on the 28th floor of a building located at 450 Park Avenue in New York City.

In 1974, Stern and Friedberg worked together in the formation of various types of investments, including motion pictures, private placements, and mergers and acquisitions. More specifically, they participated in the formation of twenty limited partnerships which invested in motion pictures. Omni had a management contract with each of these twenty limited partnerships and part of its duties included the preparation of their tax returns. Nineteen of the limited partnerships had distribution agreements with CSID. During the years 1974 through 1977, none of these twenty limited partnerships reported any taxable income although some of the partnerships did begin to report taxable income thereafter due to a decline in the amount of their depreciation deductions. None of them, however, earned an amount in excess of the cash paid in by the partners for the purchase of their partnership interests.

Ryder was aware of Stern's and Friedberg's relationship with CSIL, CSID, and Omni. The tax court found that in the sale of the Britton Properties partnership interests, Ryder might have disclosed the relationship of Stern with the other companies, but that Ryder did not recall specifically naming Stern as the person filling those positions.

At the end of the taxable year 1974, the partnership estimated that the movie, over its useful life, would produce total income of $2,143. The partnership claimed a depreciable basis of $1,730,000 and a depreciation deduction of $1,652,560 for 1974. In its return for the taxable year 1975, the partnership estimated that the film would generate only $1,208.29 in income over its useful life, which resulted in a depreciation deduction of $318,874 for that year. The 1976 and 1977 income estimates for the film were $10,000 and $5,000, respectively, resulting in additional depreciation deductions of $112,934 in 1976 and $52,920 in 1977. As of June 30, 1980, "Beyond the Law" had earned net income of $17,180.02.

On his return for the calendar year 1974, the taxpayer stated that his adjusted basis in his partnership interest was $85,635 and that the property had a useful life of three to five years. On this basis, the taxpayer claimed an investment credit of $1,998.15 and he claimed a loss from the partnership of $60,938. On his return for the calendar year 1975, the taxpayer claimed a loss from Britton Properties of $15,751. Similarly, he claimed a loss of $5,505 for the calendar year 1976, $2,531 in 1977, and $66 in the calendar year 1978.

The Commissioner of Internal Revenue ("Commissioner") issued a notice of deficiency for the calendar year 1975 which stated that the taxpayer's reported loss of $15,751 was not allowable since the partnership's claimed deduction for depreciation was disallowed. The Commissioner determined a deficiency existed because the amount of the nonrecourse indebtedness should not have been included in the basis of the taxpayer's partnership interest, and in any event, the entire partnership loss was not allowable because the activity was not engaged in for profit. The tax court agreed with the Commissioner's findings.

## II. DISCUSSION

The issues before this Court are whether the tax court erred in its determination that

1) the amount of the nonrecourse indebtedness should not be included in the depreciable basis of the taxpayer's partnership interest; and 2) the deductibility of the loss in 1975 is limited to the extent provided under section 183[2] because the purchase and subsequent distribution of the movie was an activity "not engaged in for profit." We will examine each of these issues separately.

## A. BASIS

■ Under Section 167(g), the basis for depreciation is the adjusted basis as defined in Section 1011. Section 1011 provides that in determining the gain or loss from the sale or other disposition of property, the basis of such property, as provided in Section 1012, is its cost. The cost of property includes the amount of liabilities assumed or taken subject to by the purchaser. *Crane v. Commissioner,* 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947). Although a nonrecourse note can be included in the cost basis of an asset, depreciation is based on actual investment in, rather than ownership of, the property. *Estate of Franklin v. Commissioner,* 544 F.2d 1045, 1049 (9th Cir. 1976); *Narver v. Commissioner,* 75 T.C. 53, 98 (1980), aff'd, 670 F.2d 855 (9th Cir.1982); *Mayerson v. Commissioner,* 47 T.C. 340, 350 (1966). Where the stated purchase price of the property securing the note exceeds a reasonable estimate of the property's existing fair market value, no actual investment exists as to the excess since the purchaser would be acquiring no equity in the property by making payments and therefore would have no economic incentive to pay off the note. *Estate of Franklin,* 544 F.2d at 1048. A purchaser who has no real investment in the property cannot depreciate the property. *Id.* at 1049. *See also Narver v. Commissioner,* 75 T.C. at 98.

■ A limited partner's allocable share of partnership losses is limited to the extent of the basis of his interest in the partnership. Section 704(d). A partner's interest consists of money and other property contributed to the partnership liabilities. Sections 705, 722, and 752(a). In particular, with respect to liabilities of a partnership, Section 752(c) provides that "a liability to which property is subject shall, to the extent of the fair market value of such property, be considered as a liability of the owner of the property." Thus, a limited partner's basis in the partnership property includes his allocable share of the nonrecourse debts of the partnership, but only so long as the fair market value of the property securing the debt reasonably approximates the principal amount of the debt.

■ In the case before us, the tax court found that the taxpayer had not sustained his burden of establishing that the fair market value of the movie was equal to or reasonably approximated the purchase price.[3] The tax court's finding is one of fact and may be set aside on review only if the finding is clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure; *Cates v. Commissioner of Internal Revenue,* 716 F.2d 1387, at 1389 (11th Cir.1983); *Curtis v. Commissioner,* 623 F.2d 1047, 1050–51 (5th Cir.1980).

■ The tax court concluded that the value of the movie when it was acquired in 1974 by Britton Properties was between $60,000 and $85,000. This conclusion was based on several factors. First, the Commissioner presented four expert witnesses, two of whom estimated the value of the movie to be zero and the other two who estimated its value at $60,500 and $75,000 to $85,000, respectively. The taxpayer presented no expert testimony. A second factor was the cash price paid in the two

---

**2.** Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue.

**3.** Three judges concurred in this result. In their view, however, "the test should be whether *the principal amount of the note* (not necessarily the purchase price) unreasonably ex-

ceeds the fair market value of the property." Since the movie's fair market value bore no relationship either to the amount of the note ($1,400,000) or to the purchase price ($1,730,000), we need not decide which test should apply.

prior sales of the movie. In July 1973 P & M purchased the movie from Sancrosiap for a total consideration of $50,000. CSIL then purchased the movie from P & M for $91,-250 plus the nonrecourse promissory note of $1,400,000. The cash portion of the purchase price was later reduced to $75,000. Third, Stern, the general partner, estimated that the total income to be derived from the movie over its useful life, revised as of the end of the taxable years 1974 through 1977, would be $2,143, $1,208.29, $10,500, and $5,000, respectively. The tax court found it difficult to believe that a movie which was purchased for $1,730,000 in April could decline so far in eight months that the estimated total income to be realized over the useful life of that movie would be only $2,143.

The taxpayer contends that the fair market value of the movie was in fact its purchase price since that was the amount agreed upon by a willing buyer and a willing seller, neither party acting under compulsion and both parties being fully informed of all relevant facts.[4] *See McShain v. Commissioner,* 71 T.C. 998, 1004 (1979). This definition of fair market value, however, assumes that the buyer and seller will have adverse economic interest. *Narver v. Commissioner,* 75 T.C. at 96. Here, Stern was both the general partner of the buyer, Britton Properties, and an officer of the seller, CSIL. This relationship was not specifically brought to the attention of many, if any, of the partners of Britton Properties and the legal opinion letter distributed to potential investors stated that CSIL "is not related to the General Partner nor the Limited Partners of the Partnership."

This Court holds that the tax court's finding was not clearly erroneous and thus will not be set aside. The taxpayer is not entitled to deduct any part of the depreciation claimed by the partnership which is attributable to the increase in basis of $1,400,000, which is the face amount of the nonrecourse note.

## B. SECTION 183

Since the taxpayer is not entitled to claim partnership deductions attributable to the $1,400,000 nonrecourse debt, the next question is whether the taxpayer is entitled to any claimed deductions which were attributable to the $330,000 in cash paid by the partnership for the movie.

In 1975, the year here in issue, the partnership claimed a depreciation deduction of $318,874 on its return. The taxpayer, on his return for 1975, deducted his 4.95 percent distributive share of the loss reported by the partnership. The tax court determined that the taxpayer was not entitled to deduct this claimed partnership loss because the activity of the partnership was "not engaged in for profit" as defined in Section 183(c).

Section 183(a) provides that if an individual does not engage in an activity for profit, the deductions arising out of such activity shall not be allowed except as provided in Section 183(b).[5] An "activity not engaged in for profit" is defined in Section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under Section 162 or under paragraph (1) or (2) of Section 212." If the activity is not engaged in for profit, Section 183(b) specifies the two types of deductions that are allowable. Section

---

4. At oral argument, counsel for the taxpayer also argued that the holding of *Commissioner v. Tufts,* —— U.S. ——, 103 S.Ct. 1826 [75 L.Ed.2d 863] (1983), applies to this case and requires the court to include the amount of the nonrecourse loan as basis. This Court finds that the holding of *Tufts* does not apply to the facts of this case. In *Tufts,* the Supreme Court held that a nonrecourse loan already included in basis must be accounted for upon the transfer of the encumbered property, regardless of the fair market value of the property. In this case, the question is whether the nonrecourse loan may be included in basis.

5. Section 183 was enacted as part of the Tax Reform Act of 1969 to replace the hobby loss provision of the 1954 Code, Section 270. Although Section 183 was enacted to replace Section 270, Section 183 is not limited in its application to "hobby losses." *See Hager v. Commissioner,* 76 T.C. 759, 782 n. 10 (1981); *Jasionowski v. Commissioner,* 66 T.C. 312, 321 n. 6 (1976).

183(b)(1) allows only those deductions which would be permitted whether or not such activity is engaged in for profit. Section 183(b)(2) allows the balance of the deductions that would otherwise be permitted if the activity was engaged in for profit, but only to the extent that the gross income derived from the activity exceeds the deductions allowed under paragraph (1).

Before determining whether the tax court correctly held that the activity was not engaged in for profit, we must first examine whether the profit motive analysis should be made at the partnership level, as the tax court concluded, or at the individual partner level, as the taxpayer argues. We will then turn to the question whether the tax court correctly determined that no profit motive existed.

### 1. *Level of Analysis*

■ The tax court has stated that "[e]ven though a partnership is not taxable as a separate entity but the distributable profit or loss of the partnership is reportable in the income tax return of the partners, the business of a partnership is a separate business from that of the partners or of another partnership." *Rosenthal v. Commissioner,* 48 T.C. 515, 530 (1967), *aff'd,* 416 F.2d 491 (2d Cir.1969). *Accord, Estate of Freeland v. Commissioner,* 393 F.2d 573, 584 (9th Cir.), *cert. denied,* 393 U.S. 845, 89 S.Ct. 132, 21 L.Ed.2d 117 (1968); *Barham v. United States,* 301 F.Supp. 43, 46 (M.D.Ga. 1969), *aff'd* 429 F.2d 40 (5th Cir.1970). Thus, for the purpose of computing income and deductions, "the partnership is regarded as an independently recognizable entity apart from the aggregate of its partners." *United States v. Basye,* 410 U.S. 441, 448, 93 S.Ct. 1080, 1085, 35 L.Ed.2d 412 (1973). It

is only once the partnership's income and deductions are ascertained and reported that its existence may be disregarded and the partnership becomes a conduit through which the taxpaying obligation passes to the individual partners. *Id.*

■ The tax court has previously held that the profit determination should be made at the partnership level. In *Madison Gas & Electric Co. v. Commissioner,* 72 T.C. 521 (1974), *aff'd,* 633 F.2d 512 (7th Cir.1980), the taxpayer argued that the activities of the partnership constituted a mere extension of the separate businesses of the constituent partners and that certain costs could be deducted. The tax court and Seventh Circuit rejected this contention, holding that the costs could not be deducted since they were "start-up" costs of the joint venture. In so holding, the tax court and Seventh Circuit concluded that whether the expenses were incurred in carrying on a trade or business within the meaning of Section 162(a) must be resolved at the partnership level. 72 T.C. at 565, 633 F.2d at 517. In *Goodwin v. Commissioner,* 75 T.C. 424 (1980), *aff'd without published opinion,* 691 F.2d 490 (3d Cir.1982), the taxpayer was actively engaged in the real estate business in his individual capacity, and he argued that certain loan fees, broker fees, and examination/commitment fees incurred by partnerships he formed to build a new housing project should be deductible as ordinary and necessary business expenses of his real estate business. The tax court rejected the taxpayer's argument. The tax court held that "in the context of section 162, the character of the deductions, i.e., whether they were incurred in the course of a trade or business, must be resolved at the partnership level." [6] 75 T.C. at 437.

---

**6.** For other decisions where the tax court has resolved issues at the partnership level, see *Hager v. Commissioner,* 76 T.C. 754, 782 (1981); *Van Raden v. Commissioner,* 71 T.C. 1083, 1103 (1979), *aff'd,* 650 F.2d 1046 (9th Cir.1981); *Resnik v. Commissioner,* 66 T.C. 74, 81 (1976), *aff'd,* 555 F.2d 634 (7th Cir.1977).

In oral argument, counsel for the taxpayer stated that *Riddell v. Scales,* 406 F.2d 210 (9th Cir.1969), best supports his argument that a profit motive analysis should occur at the part-

ner, rather than partnership, level. This Court agrees with the Commissioner that *Riddell* does not support the taxpayer's argument. In *Riddell,* a real estate dealer, B.B. Margolis, and the taxpayers purchased notes secured by unimproved realty and placed the notes in holding trusts. After the trusts entered an agreement to sell a portion of the land, Margolis sold his beneficial interest in the trusts to one of the taxpayers. The sale of the land was ultimately completed and in a separate action, the court

In this case, the investors chose to invest in the movie as a partnership. Since the partnership is treated as an entity distinct from its partners, it would be inconsistent to examine profit motive on a partner rather than a partnership level. Accordingly, this Court upholds the tax court's conclusion that the profit test should be applied at the partnership level.

### 2. The Profit Margin Test

■ Having concluded that the profit test should be applied on the partnership level, we must next decide if a profit motive existed. As stated earlier, Section 183 takes effect only when the taxpayer is engaged in an activity in which he is not otherwise entitled to claimed deductions under Sections 162 or 212. Thus, we must first determine whether the taxpayer was entitled to deductions under Section 162.[7] See Treas.Reg. § 1.183–2(a). Section 162 provides for deductions for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Before any deduction is allowed under Section 162(a), it must be shown that the activity was entered into with the dominant hope and intent of realizing a profit. Hirsch v. Commissioner, 315 F.2d 731, 736 (9th Cir.1963).

The Treasury Regulations under Section 183 set forth a nonexclusive list of factors to be considered when determining if the taxpayer's activities were engaged in for profit. Although Section 183 technically does not come into play until after it has been determined that the activity in question was not being carried on for a profit within the meaning of Section 162, the courts have relied upon the factors set forth in Section 183 in making the requisite profit motive analysis under Section 162. See, e.g., Golanty v. Commissioner, 72 T.C. 411, 425–26 (1979); aff'd without published opinion, 647 F.2d 170 (9th Cir.1981); Jasionowski v. Commissioner, 66 T.C. 312, 319–21 (1976); Benz v. Commissioner, 63 T.C. 375, 382–83 (1974).

The regulations provide that the determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case, but that no one factor is determinative. Treas.Reg. § 1.183–2. The regulations set forth the following nine factors which should be taken into account in considering whether the taxpayer's activities were engaged in for a profit: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; (9) elements of personal pleasure or recreation. Treas.Reg. § 1.183–2(b).

Turning to the relevant factors listed in the regulations, under factor (1), this Court holds that it was within the tax court's competence to find that the activity was not operated in a businesslike manner. Stern, the general partner, did not have any type of valuation made of the movie prior

considered the tax consequences to Margolis. Margolis v. Commissioner, 337 F.2d 1001, modified, 339 F.2d 537 (9th Cir.1964). Regarding Margolis, the court found that "insofar as his sale of his beneficial interest in the trust was attributable to his interest in the gain on sale of the land, the gain realized was ordinary income, rather than capital gain, because Margolis was individually in the business of buying and selling real estate." 406 F.2d at 212. In Riddell, however, the court found that the present taxpayers formed the joint venture for the purpose of acquiring and disposing of a parcel of property as an investment, not to conduct a real estate business. Accordingly, the court held that the gain realized from the sale of the land was capital gain rather than ordinary income. The Riddell court's examination of the joint venture as an entity is consistent with this Court's analysis.

7. We do not need to examine Section 212 since neither party contends that the property was held "for the production of income" as provided in Section 212.

to its purchase by the partnership. The movie was not copyrighted in the United States. In addition, the distribution contract[8] and the actual distribution[9] of the movie support a finding that the partnership was not operated in a businesslike manner.

Under factor (2), Stern had no experience prior to 1973 in the movie industry in general or in the distribution process of films in the United States. Friedberg's experience in the purchase and distribution of films had not been financially rewarding. The tax court concluded that the taxpayer had failed to sustain his burden of showing that these individuals were bona fide "experts" in the purchase and distribution of motion pictures.

Under factor (4), the court may examine the partnership's expectation that the assets used in the activity may appreciate in value. At the time the partnership purchased "Beyond the Law," the film's fair market value was no greater than $85,000. The movie had been purchased nine months earlier for $50,000, yet the partnership purchased the film for $1,730,000. This Court agrees with the tax court that it is unrealistic that the partnership had any true expectation that the movie would appreciate in value in an amount approaching the $1,730,000 stated cost, or even to an amount approaching the $330,000 cash payment.

Factor (5) examines the success of similar movie partnerships organized by Stern. Stern had worked with Richard Friedberg, the president of CSIL, in the formation of twenty limited partnerships which invested in motion pictures. During the years 1974 through 1977, none of these twenty partnerships reported any taxable income.

Factor (6) examines the taxpayer's history of income or losses with respect to the activity. During the first four years of the partnership's existence, the partnership reported gross losses aggregating $1,717,291 and generated income of only $5,684.

■ Having examined all relevant factors, this Court agrees with the tax court that the partnership is one "not engaged in for profit" as defined in Section 183(c).[10]

---

**8.** Stern entered into essentially the same distribution agreement with CSID as CSID previously had entered into with Stellar IV, except that half as much money was to be spent for distribution over a period twice as long, and Britton Properties was to pay a flat fee of $50,000 cash, in addition to the percentage fee. In effect, Stern obligated the partnership to pay $50,000 cash to CSID, a company of which he was an officer at the time, for $25,000 worth of distribution services.

**9.** The movie opened on July 10, 1974 at a drive-in theater in Lubbock, Texas and in its first three weeks of distribution, it had only one other play date in Texas, one in South Carolina, and two in North Carolina, all at drive-in theaters. Stern eventually did change the distributor from Stellar IV to World Wide Films, Inc. in December of 1974. Pursuant to an agreement dated July 5, 1974, however, Stellar IV had entered into a subdistribution agreement with World Wide. Therefore, in reality, this apparent change was no change at all as World Wide had been the company ultimately responsible for the distribution all along. As further evidence of the nonbusinesslike manner in which the movie was distributed, when the taxpayer became concerned about the poor distribution effects and contacted Stern, he never received a written reply.

**10.** In his dissent to the tax court opinion, Judge Whitaker disagrees with the majority's conclusion that the partnership lacked a profit motive. He finds no evidence that the limited partners at the time of their respective investments knew or should have known that the general partner intended to operate the partnership so as to preclude a profit. Thus he concludes that unless the court is constrained to consider only the actions and knowledge of the sole general partner, the majority's decision that there was no profit motive is unsupportable. This Court has already found, however, that the profit analysis must be applied at the partnership level. Since a partnership's affairs are controlled by its general partner, Uniform Limited Partnership Act, §§ 7, 9; *Donroy, Ltd. v. United States,* 301 F.2d 200, 205 (9th Cir. 1962), the tax court properly looked to the general partner's actions in determining whether the partnership, as an entity, was operated in a business-like manner.

Judge Whitaker's dissent also disagrees with the majority's implied conclusion that a partnership without a direct or indirect profit motive can be recognized as a partnership for federal income tax purposes. Because neither party contends that the lack of profit motive caused Britton Properties to fall outside of the definition of a partnership under Sections 761(a) and 7701(a)(2), we do not decide wheth-

Section 183(b) allows for certain deductions in the case of an activity not engaged in for profit. Section 183(b)(1) does not apply [11] but under Section 183(b)(2), the partnership is entitled to the deduction which would be allowable only if the activity is engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions.[12] Thus, Britton Properties is entitled to take deductions claimed, which are attributable to the $330,000 in cash paid for the movie, to the extent of the gross income derived from the activity in 1975. Accordingly, the taxpayer's pro rata share of the partnership's income of $679, which is $34, should not be included in the taxpayer's income.[13] The taxpayer's claimed partnership loss of $15,751, however, is disallowed and his income tax for the taxable year 1975 was deficient in the amount of $6,984.09.

Therefore, the judgment of the tax court is AFFIRMED.

er a profit motive is a requisite to being a partnership.

11. Section 183(b)(1) permits "the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit." The partnership did not report any deductions in 1975 which are otherwise allowed without regard to whether such activity is engaged in for profit so Section 183(b)(1) does not apply.

12. In his dissent to the tax court's opinion, Judge Whitaker argues that the court need not rely on § 183(b)(2) to allow the deductions up

to the amount of income because the court should accept as a general principle that gross income can always be offset by expense deductions regardless of whether § 183(b)(2) applies. The dissent finds fault with the majority's implication that deductions up to the amount of gross income would not have been allowed absent Section 183(b)(2). Regardless of whether Section 183(b)(2), or a general principle applies, the result in this case is the same.

13. The Commissioner had increased the taxpayer's taxable income by $34. We agree with the tax court that the inclusion of $34 as income was an error.