FOX PARK CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fox Park Corp. v. Commissioner
Docket No. 20231-80.
United States Tax Court
T.C. Memo 1985-451; 1985 Tax Ct. Memo LEXIS 181; 50 T.C.M. (CCH) 917; T.C.M. (RIA) 85451; August 27, 1985. Lowell F. Raeder, for the petitioner. Robert W. Lynch, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioner's 1975 and 1976 corporate Federal income tax of $56,863.00 and $938.88. These deficiency determinations resulted from respondent's disallowance of partnership losses and an investment credit claimed by petitioner representing its distributive share of various items of deduction and an investment credit claimed by the partnership on its returns. The partnership, H.B. Associates, was a distribution vehicle for its partners, petitioner and another corporation, who had acquired a movie for distribution in the United States. The dispositive issues are as follows: (1) Whether the partnership recognized any income for purposes of computing its depreciation deduction under *183 the income forecast method, as elected on its returns, and, if not, whether petitioner may now compute its distributive share of partnership depreciation using the straight line method; (2) Whether the partnership is entitled to an investment credit for the acquisition of the movie; and (3) Whether the partnership is entitled to a deduction for interest accrued on a purported nonrecourse debt used in the acquisition of the movie. FINDINGS OF FACT A few of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner Fox Park Corporation is a corporation with its legal residence at Ardmore, Pennsylvania. Petitioner filed Federal corporate tax returns (Forms 1120) for the calendar years 1975 and 1976 with the Internal Revenue Service office at Philadelphia, Pennsylvania.Petitioner was in the business of owning various pieces of real estate that it leased, operated, and managed. Herman E. Robinson (Robinson) was Fox Park's president and principal shareholder. Robinson had previously been an investor in theatrical productions. Robinson was also president and one of the principal *184 owners of Harjefs of Delaware, Inc. (Harjefs). Harjefs is not a party to this case. In the fall of 1975, petitioner and Harjefs acquired from Interproduction Films Company (Interproduction), as tenants in common, the United States rights to the movie "By the Blood of Others," also called "Hot Blood." The film had been produced in France at a cost of approximately $1.2 million. Before petitioner and Harjefs acquired the United States rights, the film had been distributed in Europe, generating gross box office receipts of some $3 million. Petitioner and Harjefs paid Interproduction $88,500 in cash. They also executed a nonnegotiable nonrecourse note in the amount of $600,000 secured by the film and due in 1987. The note called for interest and principal to be paid from 75 percent of the buyers' (petitioner and Harjefs) shares of the net film distribution proceeds. At the same time, petitioner and Harjefs entered into an agreement granting Joseph Green Pictures Co. (Green Pictures) the exclusive right to distribute their film. Under this agreement, Green Pictures was entitled to retain a percentage of the receipts it collected from its distribution of the film and was also entitled *185 to recoup certain expenses from the owners' (petitioner and Harjefs) shares. Although Green Pictures obtained play dates for the film in both 1975 and 1976 and received proceeds from the film's exhibition, its recoupable expenses in both years exceeded these proceeds. Consequently, Green Pictures owed no money to and paid no money to the owners (petitioner and Harjefs) in either 1975 or 1976. For the calendar years 1975 and 1976, petitioner and Harjefs filed Federal partnership returns (Forms 1065) in the name of H.B. ("Hot Blood") Associates. These partnership returns reported the following items regarding the film that petitioner and Harjefs had acquired: Amount
Amount
Item
1975
1976
Gross receipts
$42 Exhibition fees
71 Gross profit
(29)
Salaries and other wages
3,000 Interest
8,507 45,000 Legal and accounting
2,550 Depreciation
98,681 219,292 Net Loss
($112,767)
($264,292)
There is no explanation in the record for the $42 of gross receipts or the exhibition fee expense item of $71 claimed for 1975, since H.B. Associates received no payment or bill from Green Pictures, the sole distributor of the film. The interest *186 deductions represented interest accrued but unpaid on the $600,000 nonrecourse debt to Interproduction. The depreciation deduction in both years was computed under the income forecast method. In making this calculation, H.B. Associates apparently used figures supplied by the distributor, Green Pictures, stating that the film had received 15 percent of its projected gross revenues in 1975 and 33-1/3 percent in 1976. [1] Green Pictures' distribution of the film generated gross box office receipts (e.g., before the theatre owners' or subdistributors' shares) in 1975 and 1976 in the respective amounts of $139.19 and $64.50. After 1976, Green Pictures continued to try to exhibit the movie "By the Blood of Others." Green Pictures showed the film in New York *187 in September of 1977 following a heavy and expensive advertising campaign. Although this showing generated gross box office receipts of $3,966.50, Green Pictures' advertising costs of $3,650.09 exceeded its share of the box office gross of $936.51 (25 and 20 percent of box office gross) by almost 400 percent. The film was poorly received by the New York critics. As of December 31, 1980, Green Pictures did not owe and had not made any payments to H.B. Associates as a result of its distribution of the film "By the Blood of Others." By that date Green Pictures had recoupable expenses of $7,148.13. As of January 1983, Green Pictures was still entitled to recoup a deficit of $7,148.13 before making any payments to the owner, H.B. Associates. No payments have ever been made to the owners, and the distribution records do not indicate any payments due or owning to the owners. In general, the more successful a film is at the box office, the higher the percentage of box office gross receipts a distributor can negotiate to receive from the theatre owners. Green Pictures generally is able to negotiate a figure of around 35 percent of the gross box office receipts as its net film rental *188 payable by the theatre owners to it as distributor. The highest percentage Green Pictures was able to obtain from the theatre owners exhibiting "By the Blood of Others" was 25 percent. In some instances the percentage was 20 percent, and sometimes Green Pictures simply rented the film to the theatre owner for a flat $75, without receiving any part of the box office gross. Generally, in the American market, an average quality foreign film does not compete well against a domestic American film of somewhat less than average quality. Few foreign films return large amounts of money from distribution within the United States. For a film like "By the Blood of Others" to have any commercial success in the United States, its distribution requires great care, attention, and time by the distributor.The initial release is crucial; poor reviews at this point can effectively kill a film. The story of the movie "By the Blood of Others" involves a schizophrenic, paranoid young man who escapes from a mental institution. He steals a shotgun, breaks into a house occupied by a mother and her teenage daughter, and rapes the mother. He then takes the two women hostage, demanding that the prettiest *189 girl in town be brought to him within the next five hours. The town authorities hire a prostitute, but when she walks towards the house a police sharpshooter fires at the terrorist, who then shoots the prostitute. An immigrant living in the town rejects an offer of citizenship in exchange for sending one of his two daughters to the crazed young man. Finally, the mayor's daughter decides to assist the young man. She enters the house and finds that, like her, he needs someone who will care for him. They plan to escape together, but after the hostages are released and the couple approaches a getaway car, the escaped mental patient is shot down. The technical aspects of the movie "By the Blood of Others"--acting, direction, production, script, sound, music, and editing--are good to excellent. Nonetheless, the film lacks entertainment value, the key factor in the commercial success of a film. The movie is more of a grim "message" picture than an "entertainment" picture; its message is lurid and morbid and its overall mood depressing. One critic described the film as "more revolting than riveting." For the $600,000 nonrecourse note to be paid according to its terms, United States' *190 distribution of the film "By the Blood of Others" would have to generate $8.2 million or more in gross box office receipts. [2] This estimate covers only the principal and does not include the box office gross receipts necessary to pay any interest on that "debt." *191 In his statutory notice of deficiency, respondent disallowed all of petitioner's claimed distributive share of H.B. Associates' loss and investment credit. His notice stated in part that petitioner had "not established the amount and character of such losses and credits" and that petitioner had failed to establish "that the alleged events, transactions and expenditures ever occurred in fact or in substance." It is not clear from the record what books and records, if any, H.B. Associates kept or on what basis the partnership determined, as reported in its return, that it had received or earned $42 in 1975. ULTIMATE FINDINGS OF FACT 1.H.B. Associates neither earned nor received any gross income from the film in 1975 and 1976. 2. The fair market value in 1975 of the film "By the Blood of Others" did not exceed $88,500, the cash paid for the film. 3. Both the purchase price ($688,500) of the film and the principal amount ($600,000) of the nonrecourse debt substantially and unreasonably *192 exceeded the fair market value of the film securing the obligation. 4. The $600,000 nonrecourse note did not constitute a genuine indebtedness. OPINION At issue in this case are deductions and an investment credit claimed by petitioner as a result of the acquisition of the movie "By the Blood of Others" and exploitation of that film through a partnership, H.B. Associates. Respondent has disallowed the deductions and credit on a variety of theories. Both parties spent a great deal of time addressing the question of whether petitioner's motion picture venture was an activity engaged in for profit. However, we need not decide that issue. As discussed below, we hold that petitioner is not entitled to deductions for depreciation or interest during the years in issue, or its claimed investment tax credit, but these determinations do not rest upon petitioner's profit objective. The only items that might otherwise require inquiry into petitioner's profit objective--the salaries/other wages and legal accounting fees H.B. Associates claimed in 1975--were not substantiated under whatever method of accounting H.B. Associates used. There is simply no evidence in the record that such *193 amounts were paid or incurred. The fact that these alleged expenses were claimed on the partnership return is not evidence, but merely a statement of the claim. Wilkinson v. Commissioner,71 T.C. 633, 639 (1979); Roberts v. Commissioner,62 T.C. 834, 837 (1974); Seaboard Commercial Corp. v. Commissioner,28 T.C. 1034, 1051 (1957). Petitioner's only response to respondent's argument that these expense items were not substantiated is that substantiation was not raised in the statutory notice. Petitioner's objection is not well founded. One of the bases for disallowance in respondent's statutory notice was that petitioner had failed to establish that "the alleged events, transactions and expenditures ever occurred in fact or in substance." We fail to see how respondent's administrative determination that petitioner's motion picture venture was a sham is somehow a concession that certain claimed expenses were in fact paid or incurred. We have carefully examined the entire record and find no basis for implying a concession on respondent's part. Our holding that petitioner has failed to substantiate these items makes it unnecessary *194 to decide the question of petitioner's profit objective. In our resolution of what we view as the dispositive issues, we assume without deciding that petitioner's motion picture venture was undertaken with the profit objective required of a corporate taxpayer. See International Trading Co. v. Commissioner,275 F. 2d 578, 583-584 (7th Cir. 1960), affg. a Memorandum Opinion of this Court; Adirondack League Club v. Commissioner,55 T.C. 796, 808, 809 (1971), affd. per curiam 458 F. 2d 506 (2d Cir. 1972); Yanow v. Commissioner,44 T.C. 444 (1965), affd. 358 F. 2d 743 (3d Cir. 1966). See also Professional Insurance Agents v. Commissioner,78 T.C. 246, 262 (1982), affd. 726 F. 2d 1097 (6th Cir. 1984); Adirondack League Club v. Commissioner,supra,55 T.C. at 816-818 (Dawson, J. Concurring). Even with this generous assumption in petitioner's favor, [3] respondent's disallowances must be sustained for the reasons discussed below. *195 On its partnership return, H.B. Associates computed its depreciation on the film "By the Blood of Others" using the income forecast method. As we recently stated in Fife v. Commissioner,82 T.C. 1, 8-9 (1984): When a * * * partnership elects to use the income forecast method to calculate its allowable depreciation deduction for a motion picture under section 167, it does so by multiplying its basis in the film by a fraction, the numerator of which is the income from the film properly reportable by the partnership under its method of accounting for the taxable year, and the denominator of which is the forecasted total income to be derived from such film during its useful life. [Emphasis supplied.] See also Greene v. Commissioner,81 T.C. 132, 136-139 (1983); Wildman v. Commissioner,78 T.C. 943, 951 (1982); Siegel v. Commissioner,78 T.C. 659, 691-694 (1982). The record is not wholly clear as to what method of accounting--cash or accrual--H.B. Associates used.Its treatment of the interest on its returns *196 suggests the accrual method, since no interest payments were in fact made. On the other hand, petitioner's argument herein regarding basis for depreciation and the investment tax credit (constructive receipt and economic benefit) suggests the cash method. Whatever H.B. Associates' method of accounting, the result is the same. Exploitation of the film "By the Blood of Others" was carried out pursuant to the distribution agreement with Green Pictures. Whether viewed under the "all events" test for accrual or under the "constructive receipt" and "economic benefit" doctrines, H.B. Associates had no income from the film: Every dollar that the distributor, Green Pictures, earned or received, it was entitled to keep as recoupment of its promotion costs. [4] Petitioner's argument herein is really nothing but a reformulation of the argument that the numerator of the income forecast fraction should be the distributor's gross receipts. That is an argument that we have repeatedly rejected and do so again. Fife v. Commissioner,supra; Greene v. Commissioner,supra; Wildman v. Commissioner,supra; Siegel v. Commissioner,supra. *197 See also Gordon v. Commissioner,766 F. 2d 293 (7th Cir. 1985), affg. a Memorandum Opinion of this Court. We likewise reject petitioner's alternative argument that it is entitled to depreciate the film under the straight line method. Petitioner's reliance upon Silver Queen Motel v. Commissioner,55 T.C. 1101 (1971) and Rev. Rul. 72-491, 1972-2 C.B. 104, is mistaken. Unlike the cited case and ruling, petitioner is not seeking to correct an initial election of an improper method of depreciation. The income forecast method is an appropriate and *198 allowable method for depreciating motion pictures. Fife v. Commissioner,supra; Greene v. Commissioner,supra; Wildman v. Commissioner,supra; Siegel v. Commissioner,supra.Proper application of this method resulted in depreciation deductions of zero for both years in question. A depreciation method is a method of accounting, and a taxpayer must obtain the Commissioner's consent to a change of accounting method.Sec. 446(e); [5]secs. 1.167(b)-0(c), 1.167(e)-1, Income Tax Regs. As we have previously held, "[S]ince [petitioners] chose an acceptable method of depreciation in the first instance, petitioners cannot now change that method absent the required consent." Wildman v. Commissioner,supra,78 T.C. at 952-953. Accordingly, we sustain respondent's determination and hold that petitioner is not entitled to change the acceptable method of depreciation chosen and is not entitled to depreciation under the straight line method. *199 Petitioner likewise is entitled to no investment credit. Petitioner acquired its interest in the film during 1975 and consequently is governed by the provisions of section 48(k). [6]Wildman v. Commissioner,supra,78 T.C. at 954-957. See also Fife v. Commissioner,supra.Thus, the investment credit is allowable only for new motion pictures, sec. 48(k)(1)(A)(i), and a taxpayer's qualified investment for computing the credit is its "qualified United States production costs." Sec. 48(k)(4)(B). Petitioner's acquisition of its interest in "By the Blood of Others" clearly fails both tests. The film had been widely exhibited in Europe prior to petitioner's acquisition, and therefore was clearly used property, not new. Sec. 1.48-8(a)(2), Income Tax Regs; Fife v. Commissioner,supra.
*200 Likewise, the film was produced in France, and consequently no United States production costs were incurred. Wildman v. Commissioner,supra.Section 1.48-8(a)(2), Income Tax Regs., provides in pertinent part: Once a qualified film is placed in service in any medium of exhibition in any geographical area of the world, it becomes used property and no investment credit with respect to the film is available to a taxpayer that acquires the film after that time (except for subsequently incurred costs described in paragraph (e)(9) of this section which the taxpayer incurs). Section 1.48-8(e)(9), Income Tax Regs., provides in pertinent part: (9) Subsequently incurred costs. The only costs incurred after a qualified film has been placed in service which are includible in production costs are the cost of preparing prints placed in service within 12 months after the film (or part) is initially released for public exhibition *201 in any medium, residuals described in paragraph (e)(3) of this section, and participations described in paragraph (e)(4) of this section. Thus, the cost of additions, modifications, or editing of a film for a new medium incurred after the film is placed in service, is not includible in production costs. Petitioner argues that H.B. Associates incurred certain United States production costs under this regulation for which the investment credit is allowable. We disagree for several reasons. First, we think that the regulation's language regarding the film's initial release for public exhibition in any medium plainly refers to the release in Europe by the previous owner of "By the Blood of Others." Whatever editing was done in this country was for a new medium, and thus not includable in production costs. Second, the sparse documentation of these claimed expenses suggests that such costs were incurred by the distributor, Green Pictures, between January and April of 1976. It is far from clear that such costs of preparing prints were incurred "within 12 months after the film (or part) [was] initially released for public exhibition * * *." Third, the distributor, Green Pictures, actually *202 incurred any such expenses subject only to possible recoupment out of H.B. Associates' share of distribution receipts, if such monies were ever generated by box office receipts. We cannot find that H.B. Associates, and thus derivatively petitioner, has actually incurred or will ever incur any United States production costs within the exception of section 1.48-8(e)(9), Income Tax Regs.
We are also unpersuaded by petitioner's argument that these legal grounds for disallowance of the claimed credit were not properly raised in the statutory notice. Respondent's notice was broadly phrased and pointed to his primary administrative determination that the whole transaction was a sham. The notice did state that petitioner had "not established the amount and character of such * * * credits * * *." We think this broad disallowance was sufficient. Like deductions, tax credits are matters of legislative grace and taxpayers must prove their entitlement thereto by satisfying the specific statutory requirements. See Hokanson v. Commissioner,730 F. 2d 1245, 1250 (9th Cir. 1984), *203 affg. a Memorandum Opinion of this Court; Uecker v. Commissioner,81 T.C. 983, 998 (1983); Bloomberg v. Commissioner,74 T.C. 1368 (1980). Petitioner has not done so here.Even if we were to treat these items as new matters as to which respondent bears the burden of proof, such burden has been satisfied. The evidence of record clearly establishes that the film "By the Blood of Others" was used property when petitioner and Harjefs acquired it. The film had been extensively distributed in Europe beforehand and was not new property. H.B. Associates has not paid or incurred any subsequently incurred costs of the type covered by section 1.48-8(e)(9), Income Tax Regs. Petitioner is not entitled to any distributive share of any investment credit claimed by H.B. Associates. Finally, we hold that petitioner is not entitled to deduct its distributive share of interest accrued on the purported $600,000 nonrecourse purchase obligation to Interproduction. For "interest" to be deductible under section 163, the taxpayer must pay for the use *204 or forbearance of money upon a genuine indebtedness. Odend'hal v. Commissioner,748 F. 2d 908 (4th Cir. 1984), affg. 80 T.C. 588 (1983), cert. denied     U.S.     (June 3, 1985); Estate of Franklin v. Commissioner,544 F. 2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Norton v. Commissioner,474 F. 2d 608, 610 (9th Cir. 1973), affg. a Memorandum Opinion of this Court; Surloff v. Commissioner,81 T.C. 210, 242 (1983); Flowers v. Commissioner,80 T.C. 914 (1983); Narver v. Commissioner,75 T.C. 53, 98 (1980), affd. 670 F. 2d 855 (9th Cir. 1982). In Flowers v. Commissioner,supra,80 T.C. at 942, we recently stated: Where both the purchase price and the lesser principal amount of the nonrecourse note which makes up a portion of such purchase price unreasonably exceed the value of the property acquired, then no "genuine indebtedness" exists and no "investment in the property" occurs. Estate of Franklin v. Commissioner,544 F. 2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *205 Odend'hal v. Commissioner,80 T.C. 588, 604 (1983); Hager v. Commissioner,76 T.C. 759, 788 (1981); Narver v. Commissioner,75 T.C. 53 (1980), affd. per curiam 670 F. 2d 855 (9th Cir. 1982); Beck v. Commissioner,74 T.C. 1534 (1980), affd. 678 F. 2d 818 (9th Cir. 1982). The purported $600,000 nonrecourse obligation is not a genuine indebtedness. [7]
*206 As stated in our findings, we concluded that the fair market value of the film "By the Blood of Others" was no more than $88,500, the cash actually paid by petitioner and Harjefs. We did not accept the ultimate valuation figures testified to by respondent's experts ($6,700.50 and zero). Nonetheless, we found much of their analyses persuasive. Although the film was technically well produced and had had some success in Europe, foreign films generally do not compete well in the United States market.We agree with respondent's experts that the film's morbid and depressing tale is not the type of entertainment that most moviegoers seek. By contrast, we were unimpressed by petitioner's expert, who, in his written report and at trial, essentially stated: Considering all of the circumstances involved including the financial status of the investor as well as the method of payment, this would seem to be a fair price for the movie. [Emphasis supplied.] Petitioner's expert undertook no serious analysis regarding the manner and the cost of distribution, nor did he make any projection of anticipated box office receipts or other film rentals. Indeed, as respondent suggests, it is fair *207 to imply that petitioner's expert viewed "fair market value" within the context of the tax shelter market place, not simply the value of the movie as a movie. Cf. Skripak v. Commissioner,84 T.C. 285 n. 38 at 327-328 (1985). "By the Blood of Others" required careful and attentive distribution for it to have any chance at all of making money. Regardless of the qualifications of the distributor, we think it simply would be impossible for this movie to generate the approximately $8.2 million dollars of box office gross receipts minimally necessary to pay the $600,000 nonrecourse note according to its terms.See footnote 2, supra. The distributor's report to H.B. Associates to enable it to make its calculations under the income forecast method for 1975 and 1976 stated that the sums of $139.19 and $64.50 represented 15 percent and 33-1/3 percent, respectively, of the projected gross box office receipts to be expected from the film. These statements hardly enhance petitioner's argument that the film was worth $688,500. See e.g., Brannen v. Commissioner,78 T.C. 471, 497-498 (1982), affd. 722 F. 2d 695 (11th Cir. 1984). Petitioner *208 argues that the Supreme Court's decision in Commissioner v. Tufts,461 U.S. 300 (1983), requires the recognition for tax purposes of the nonrecourse note regardless of the fair market value of the film securing it. We have recently considered and rejected that very argument. Herrick v. Commissioner, 85 T.C.     (filed August 5, 1985). See also Odend'hal v. Commissioner,supra,748 F. 2d at 912-914, where the Fourth Circuit exhaustively analyzed and rejected the argument, reaching the same conclusion we have now adopted.[8]
In Tufts, the Supreme Court held that when a taxpayer disposes of property encumbered by a nonrecourse indebtedness in an amount in excess of the fair market value of the property, he must include in his amount realized the outstanding amount of that nonrecourse obligation. The rationale underlying Tufts was a symmetrical treatment for a nonrecourse liability that had been properly included in basis initially; in such circumstances, *209 the nonrecourse debt must thereafter also be included in the amount realized on disposition of the encumbered property. In Tufts, the Supreme Court was not faced with a question of whether the purported nonrecourse liability should be included in basis initially. [9] As the Court of Appeals for the Fourth Circuit stated in Odend'hal v. Commissioner,supra,748 F. 2d at 913: We see nothing in Tufts to alter the well-established rules that a taxpayer may not * * * claim an interest deduction where he has neither personal liability nor economic incentive to pay. In reaching these conclusions, we note that while Tufts did state that "Crane also stands for the broader proposition . . . that a nonrecourse loan shall be treated as a true loan," 461 U.S. at 313, 103 S. Ct. at 1834, it emphasized that Crane was "predicated on the assumption that the mortgage will be repaid in full," i.d. 103 S. Ct. at 1836, and that "the original inclusion of the amount of the mortgage in basis rested on the assumption that the mortgagor incurred *210 an obligation to repay." The crucial assumption that the nonrecourse note would be repaid is lacking in this case. Petitioner had no economic incentive to repay the said obligation. Thus, nothing in Tufts undermines the long line of decisions, by this and other courts, holding that a nonrecourse debt is not a genuine indebtedness for Federal tax purposes unless the property involved reasonably secures that purported obligation. In this case, both the $600,000 principal amount of the nonrecourse obligation and the $688,500 contract price are grossly inflated and far in excess of the film's fair market value. Accordingly, the nonrecourse obligation is not a *211 bona fide indebtedness for Federal tax purposes and petitioner is not entitled to deduct any interest with regard to the $600,000 nonrecourse note. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. On its partnership returns for both depreciation and investment credit, H.B. Associates listed a depreciable cost basis for the film of $692,500. The record does not explain this discrepancy. In computing the depreciation under the income forecast method, H.B. Associates used 15 percent of $657,875 and 33-1/3 percent of $657,875 as its depreciation deduction. That is an incorrect application of the income forecast method.↩
2. Our calculation below is based on the distribution agreement between Green Pictures and petitioner and Harjefs. We have assumed that the distributor could obtain percentage rental bookings returning it 35 percent of the box office gross (Green Pictures' general rate). Our estimates of various distribution expenses are one-half of an average of those expenses reflected in various computations of respondent's experts in their reports, most of which we have converted to a percentage of box office gross receipts. We have used one-half of these average expense estimates to reflect certain cost efficiencies in the large scale distribution necessary to generate the needed receipts, and also because if we used the full average expense estimates, it would result in a required box office gross of around $230 million.Needless to say, many of our estimates and assumptions work in petitioner's favor. Box office gross receipts
$8,242,423 Less theatre owners' shares
(65%)
(5,357,575)
Distributor's gross share
(35%)
(2,884,848)
Owners' Share of Distributor's Gross Share
as Per Distribution Agreement
First $200,000
(30%)
60,000
Next $200,000
(40%)
80,000
Next $100,000
(50%)
50,000
Next $100,000
(60%)
60,000
Balance
(70%)
1,599,394
Owners' gross
$1,849,394
Less Costs Chargeable to Owners
Distribution costs
(4.375% of gross receipts)
$360,606
Co-op advertising
(5% of gross receipts)
412,121
Cost of prints
(2.75% of gross receipts)
226,667
Advertising markup This figure did not vary with the varying gross rentals in any of respondent's experts' reports, unlike the other expenses. Accordingly, we have determined a flat figure for this item.
*--
50,000
Total expenses:
$1,049,394
Net to Owners
$800,000
75% Interproduction as per note
$600,000
Even excluding all expenses and all interest, and even assuming that H.B. Associates would gratuitously pay Interproduction 100 percent of its share, rather than the 75 percent its partners were "obligated" to pay, it would require a box office gross of over $3.1 million for H.B. Associates to pay the $600,000 nonrecourse note.↩
3. If we were required to decide the profit objective issue, we think that on the objective facts of record respondent has the better of the argument. However, this case can be disposed of on other grounds. Moreover, even if we were to find that petitioner's film activity constituted an activity engaged in for profit, as petitioner so strenuously urges, that would not assist petitioner here. See Sheid v. Commissioner,T.C. Memo. 1985-402 (filed August 7, 1985). There, on a fact situation far more favorable to the taxpayer than the facts in the present case, the Court found that the sale of the film was an arms'-length transaction, that the fair market value of the film was the purchase price (the sum of $1,200,000, payable $280,000 in cash and $920,000 in the form of a nonrecourse note payable out of film revenues), but that the $920,000 nonrecourse obligation was too speculative and contingent to be included in basis. Thus, even if we found for petitioner on the profit objective issue, we would still rule against petitioner based upon the contingent debt cases. Estate of Baron v. Commissioner,83 T.C. 542 (1984). See also Gibson Products Co. v. United States,637 F. 2d 1041 (5th Cir. 1981); Brountas v. Commissioner,692 F. 2d 152 (1st Cir. 1982), cert. denied 462 U.S. 1106 (1983), vacating and remanding on other grounds 73 T.C. 491 (1979); and CRC Corp. v. Commissioner,693 F. 2d 281 (3d Cir. 1982), cert. denied 462 U.S. 1106 (1983), affg. in part, revg. and remanding on other grounds Brountas v. Commissioner,73 T.C. 491↩ (1979).
4. H.B. Associates' 1975 return reported $42 in gross income and $71 of related expense. These figures do not correlate with the figures reported by the distributor, Green Pictures. The distribution agreement with Green Pictures was exclusive, and there is no indication that H.B. Associates earned any money from the exploitation of the film in any other manner. These items on H.B. Associates' return are completely unexplained. It is clear from the record that H.B. Associates received no income during 1975 and 1976, nor was it entitled to receive any income during these years.↩
5. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question.↩
6. Section 48(k), as it applied to the taxable calendar year 1975, provided in pertinent part as follows: (k) Movie and Television Films.-- (1) Entitlement to Credit.-- (A) In General.--A credit shall be allowable under section 38 to a taxpayer with respect to any motion picture film or video tape-- (i) only if such film or tape is new section 38 property (determined without regard to useful life) which is a qualified film * * * * * * (4) Predominant Use Test; Qualified Investment.--In the case of any qualified film-- (A) section 48(a)(2) shall not apply, and (B) in determining qualified investment under section 46(c)(1), there shall be used (in lieu of the basis of the property) an amount equal to the qualified United States production costs (as defined in paragraph (5)). (5) Qualified United States Production Costs.-- (A) In General.--For purposes of this subsection, the term "qualified United States production costs" means with respect to any film-- (i) direct production costs allocable to the United States, plus (ii) if 80 percent or more of the direct production costs are allocable to the United States, all other production costs other than direct production costs allocable outside the United States. (B) Production Costs.--For purposes of this subsection, the term "production costs" includes-- (i) a reasonable allocation of general overhead costs, (ii) compensation (other than participations described in clause (vi)) for services performed by actors, production personnel, directors, and producers, (iii) costs of "first" distribution of prints, (iv) the cost of the screen rights and other material being filmed, (v) "residuals" payable under contracts with labor organizations, and (vi) participations payable as compensation to actors, production personnel, directors, and producers. Participations on all qualified films placed in service by a taxpayer during a taxable year shall be taken into account under clause (vi) only to the extent of the lesser of 25 percent of each such participation or 12 1/2 percent of the aggregate qualified United States production costs (other than costs described in clauses (v) and (vi) of this subparagraph) for such films, but taking into account for both the 25 percent limit and 12 1/2 percent limit no more than $1,000,000 in participations for any one individual with respect to any one film. For purposes of this subparagraph (other than clauses (v) and (vi) and the preceding sentence), costs shall be taken into account only if they are capitalized. (C) Direct Production Costs.--For purposes of this paragraph, the term "direct production costs" does not include items referred to in clause (i), (iv), (v), or (vi) of subparagraph (B). The term also does not include advertising and promotional costs and such other costs as may be provided in regulations prescribed by the Secretary. (D) Allocation of Direct Production Costs.--For purposes of this paragraph-- (i) Compensation for services performed shall be allocated to the country in which the services are performed, except that payments to United States persons for services performed outside the United States shall be allocated to the United States. For purposes of the preceding sentence, payments to an electing small business corporation (within the meaning of section 1371) or a partnership shall be considered payments to a United States person only to the extent that such payments are included in the gross income of a United States person other than an electing small business corporation or partnership. (ii) Amounts for equipment and supplies shall be allocated to the country in which, with respect to the production of the film, the predominant use occurs. (iii) All other items shall be allocated under regulations prescribed by the Secretary which are consistent with the allocation principle set forth in clause (ii).↩
7. We note that in Brannen v. Commissioner,78 T.C. 471 (1982), affd. 722 F. 2d 695 (11th Cir. 1984), we stated that the test was whether the stated purchase price unreasonably exceeds the value of the property, 78 T.C. at 493, whereas in Hager v. Commissioner,76 T.C. 759 (1981), we stated that the test was whether the principal amount of the nonrecourse indebtedness unreasonably exceeds the value of the property, 76 T.C. at 773. We need not decide which test is appropriate on the facts before us (see Brannen v. Commissioner,supra,78 T.C. at 513 (Chabot, J.,↩ concurring)), because we find that both the purchase price and the principal amount of the nonrecourse debt unreasonably exceeded the value of the film.
8. See also Brannen v. Commissioner,722 F. 2d 695 n. 4 at 702 (11th Cir. 1984); Flowers v. Commissioner,supra,80 T.C. n. 44 at 943-944↩.
9. Moreover, even when looking at the front end of the transaction in Commissioner v. Tufts,461 U.S. 300 (1983), it is factually distinguishable. There, the value of the property securing the nonrecourse indebtedness at the time the indebtedness was incurred was equal to or in excess of the amount of the obligation. Such is not the case here. Tufts↩ also involved an advance of funds by a third-party lender on a nonrecourse basis rather than the seller "financing" involved in this case.