T.C. Memo. 2000-109


UNITED STATES TAX COURT


FRED B. AND GEORGIA ELANE BERRY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1119-98.                    Filed March 29, 2000.


<u>Rufus E. Wolff</u>, for petitioners.

<u>Donald E. Edwards</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COLVIN, <u>Judge</u>:  Respondent determined that petitioners have a $15,570 deficiency in income tax for 1995.

The issue for decision is whether petitioners operated their farm and horse-breeding activity for profit in 1995.  We hold that they did not.

Section references are to the Internal Revenue Code in effect during the year in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

A.   Petitioners

Petitioners lived in Roland, Arkansas, when they filed their petition. They have five grown children, three through previous marriages.

Petitioner Elane Berry (Mrs. Berry) spent time on her grandparents' farm when she was a child. She bought a horse when she was 9. When she was 15, she raised a filly born to a mare that she had bought. She worked full time as an x-ray technician after she graduated from high school.

Petitioner Fred Berry (Dr. Berry) graduated from Tulane University Medical School in 1949. He has practiced medicine since then. Dr. and Mrs. Berry were married in 1972. Dr. Berry could not work for 2 months in 1985 because he was ill. In 1991, Dr. Berry cashed in one of his retirement plans and received about $17,000.

Dr. Berry and his sister inherited some apartment houses, which his sister managed, and mutual funds, which Dr. Berry managed. Dr. Berry's sister began liquidating the apartment houses around 1991. The amount Dr. Berry received is not stated in the record. In 1994, Dr. Berry liquidated some of the mutual

funds in 1994, but he kept as much as possible because they were appreciating in value rapidly.

Mrs. Berry worked part time as the office manager for Dr. Berry's surgical clinic until he closed the clinic in 1995. Dr. Berry has practiced medicine at the White River Rural Health Service since then.

B. Petitioners' Farm

1. Starting the Horse-Breeding Activity

Dr. and Mrs. Berry bought a 127-acre farm in Roland, Arkansas, in 1974 and moved to the farm in 1979. Petitioners grew soybeans in 1979 and started a horse-breeding activity in 1980 which they called Berry Lane Farm.

2. Racking Horses

Petitioners decided to breed racking horses. Racking horses and Tennessee walking horses have the same bloodlines. Tennessee walking horses walk with at least three feet on the ground, over-striding rear legs, a reaching motion in their front legs, and a nodding head. Racking horses walk with at least one foot on the ground, a folding motion in their front legs, and heads that are steadier than those of Tennessee walking horses.

Petitioners decided to breed racking horses because they thought racking horses were increasing in popularity faster than any other kind of horse and were more affordable than Tennessee walking horses. In addition, Mrs. Berry believed that the

training techniques used to develop a Tennessee walking horse's gait were cruel.

3. <u>Advice From Others</u>

Heidi Haskins, a friend of petitioners who raised horses, recommended that they buy a broodmare in foal. Petitioners bought two broodmares in foal in 1980. However, petitioners did not have a plan for selling the colts born to those broodmares and had difficulty selling them.

At a time not specified in the record, Mrs. Berry sought advice from Ann Yeiser (Yeiser), who published a racking horse magazine. Yeiser told Mrs. Berry that petitioners had received bad advice on what broodmares to buy and that they needed a better trainer. Yeiser suggested several trainers for petitioners to use, including Joe Dan Carter (Carter).

Petitioners hired Carter to be their trainer in 1985. Carter has been a professional horse trainer since 1976. He bought a horse from petitioners, apparently in 1995 or later. On a date not stated in the record, Carter told petitioners that their horses would sell better if they bred famous Tennessee walking horses. Carter sold one of petitioners' horses for $24,000 in 1996.

James Roberts (Roberts) is an analyst for the Tennessee Farm Bureau Federation. Mrs. Berry met him in 1988 or 1989. Roberts has shown racking horses since 1988. He was vice chairman of the

Racking Horse Association's promotions committee in 1999.  He has shown and has tried to sell petitioners' horses at events.

On a date not specified in the record, Mrs. Berry asked Roberts for advice about raising horses and farming.  Roberts advised Mrs. Berry to breed her horses with higher quality horses.  He also advised her to train more of her horses as Tennessee walking horses.  He advised her to reduce her farm expenses and to find better ways to market her animals.

4.    Operating the Farm and Horse-Breeding Activity

Mrs. Berry has managed petitioners' farm and horse-breeding activity since 1979.  She supervises the farm's employees and does manual labor on the farm.  Before 1995, Mrs. Berry worked part time for Dr. Berry.  She could schedule her work at the office to accommodate her work at the farm.  She worked on petitioners' farm and horse-breeding activity 60 to 70 hours per week in 1995.  Dr. Berry worked on the farm only occasionally.

Petitioners had one to five employees during each year from 1985 through the year in issue.  The record does not state how many employees petitioners had at any one time.

Mrs. Berry read magazines and journals about horses and took courses and seminars on breeding at the University of Tennessee at Murfreesboro.  She learned how to artificially inseminate broodmares.  She offered this service for a flat fee.

In 1995, Mrs. Berry was a member of the Futurity Breeders Association, the Amateur Association, the Pleasure Association, and the Arkansas Racking Horse Association. Mrs. Berry rode a horse only once or twice in 1995.

Mrs. Berry takes horses to a 9-day racking horse celebration held at Decatur, Alabama, every September, at which the Racking Horse Breeders Association selects the world champions for the year. Mrs. Berry usually enters horses in a 3-to-4-day show at Shelbyville, Tennessee, a 4-day spring celebration, and some 1-day horse shows. Mrs. Berry washes, grooms, and clips her horses and braids their manes for the shows, but she usually does not show the horses herself. Potential customers see petitioners' horses at shows.

5. Books and Records for the Farm and Horse-Breeding Activity

Mrs. Berry kept a disbursement journal and general ledger for the farm from 1981 through the year in issue. She also kept records of horses that she bought and sold and the births and deaths of horses on petitioners' farm. Petitioners had a separate bank account for their farm.

6. The Number of Horses on Petitioners' Farm

Petitioners had the following numbers of horses on their farm:[1]

---

[1] Petitioners' summary states that they had six broadmares
(continued...)

| Year | Show | Brood mares | Weanlings | Yearlings | 2 Year | 3 Year | Stallions |
|------|------|------|------|------|------|------|------|
| 1980 | 1 | 2 | 0 | 0 | 0 | 0 | 0 |
| 1981 | 4 | 8 | 6 | 1 | 0 | 0 | 0 |
| 1982 | 4 | 8 | 8 | 6 | 1 | 0 | 1 |
| 1983 | 3 | 12 | 9 | 8 | 3 | 0 | 2 |
| 1984 | 4 | 16 | 9 | 7 | 7 | 3 | 2 |
| 1985 | 6 | 14 | 6 | 7 | 1 | 1 | 1 |
| 1986 | 2 | 10 | 4 | 5 | 1 | 0 | 1 |
| 1987 | 2 | 8 | 6 | 3 | 1 | 1 | 1 |
| 1988 | 4 | 7 | 5 | 5 | 2 | 0 | 1 |
| 1989 | 2 | 5 | 2 | 3 | 1 | 0 | 1 |
| 1990 | 2 | 5 | 5 | 2 | 1 | 1 | 1 |
| 1991 | 1 | 5 | 4 | 5 | 0 | 1 | 1 |
| 1992 | 1 | 5 | 4 | 4 | 4 | 0 | 1 |
| 1993 | 1 | 5 | 3 | 3 | 4 | 1 | 1 |
| 1994 | 1 | 6 | 4 | 3 | 3 | 3 | 1 |
| 1995 | 1 | 6 | 4 | 3 | 3 | 2 | 1 |
| 1996 | 0 | 6 | 5 | 3 | 3 | 1 | 1 |
| 1997 | 0 | 7 | 3 | 4 | 1 | 0 | 1 |
| 1998 | 0 | 13 | 9 | 4 | 3 | 0 | 1 |

7.    The Number of Horses That Petitioners Sold

Petitioners sold the following numbers of horses from 1982 through 1998:

---

    [1](...continued)
in 1994.  Petitioners do not explain why their records are
inconsistent.

| Year | Total sales | Number sold | Highest sales price |
|------|------------|-------------|---------------------|
| 1982 | $6,900 | 3 | $5,000 |
| 1983 | 352 | 1 | 352 |
| 1984 | 16,170 | 13 | 3,700 |
| 1985 | 17,471 | 15 | 2,500 (twice) |
| 1986 | 7,400 | 6 | 2,000 |
| 1987 | 4,260 | 4 | 1,260 |
| 1988 | 9,950 | 9 | 2,700 |
| 1989 | 2,000 | 2 | 1,500 |
| 1990 | 8,900 | 4 | 3,400 |
| 1991 | 5,000 | 2 | 3,800 |
| 1992 | 7,150 | 4 | 4,000 |
| 1993 | 750 | 1 | 750 |
| 1994 | 4,588 | 4 | 2,400 |
| 1995 | 4,905 | 4 | 2,400 |
| 1996 | 36,600 | 6 | [1]24,000 |
| 1997 | 6,300 | 2 | 3,600 |
| 1998 | 2,000 | 1 | 2,000 |

[1] Petitioners' next highest price in 1996 was $3,750.

8. Petitioners' Income From Farm Products, Horse Show Prizes, Stud Fees, and Boarding Fees

Mrs. Berry usually entered horses in six to eight shows each year. Petitioners boarded horses for other people and provided stud services from 1982 through 1997. Petitioners received the following amounts of horse show prize money, stud fees, and fees for boarding horses:

| Year | Total | Horse show prize money | Stud fees | Boarding fees |
|------|-------|------------------------|-----------|---------------|
| 1982 | $2,137 | $471 | -0- | $1,666 |
| 1983 | 402 | 117 | $250 | 35 |
| 1984 | 1,423 | 50 | 1,050 | 323 |
| 1985 | 1,524 | 25 | 1,300 | 199 |
| 1986 | 2,250 | -0- | 1,850 | 400 |
| 1987 | 1,552 | 103 | 1,200 | 249 |
| 1988 | 400 | -0- | 400 | -0- |
| 1989 | 1,005 | 211 | 500 | 294 |
| 1990 | 3,227 | 1,343 | 930 | 954 |
| 1991 | 3,957 | 2,331 | 1,054 | 572 |
| 1992 | 5,274 | 2,263 | 1,050 | 1,961 |
| 1993 | 8,935 | 1,634 | 2,250 | 5,051 |
| 1994 | 7,036 | 1,085 | 1,200 | 4,751 |
| 1995 | 6,607 | 1,765 | 400 | 4,442 |
| 1996 | 14,308 | 2,469 | 3,100 | 8,739 |
| 1997 | 17,253 | 3,350 | 5,100 | 8,803 |

Petitioners received the following amounts of income from growing and selling grain (includes wheat and soybeans), pecans, and hay and from hauling horses:

| Year | Total | Grains | Pecans | Hay | Horse hauling |
|------|-------|--------|--------|-----|---------------|
| 1981 | $1,396 | – | -- | $1,396 | -- |
| 1982 | 6,494 | $5,428 | -- | 1,066 | -- |
| 1983 | 2,809 | 2,533 | -- | 276 | -- |
| 1984 | 4,472 | 3,938 | -- | 534 | -- |
| 1985 | 8,067 | 7,670 | -- | 397 | -- |
| 1986 | 20 | – | -- | 20 | -- |
| 1987 | 2,197 | 2,030 | -- | 167 | -- |
| 1988 | 13,894 | 13,432 | $120 | 342 | -- |
| 1989 | 8,703 | 6,851 | -- | 1,852 | -- |
| 1990 | 2,150 | 1,329 | -- | 821 | -- |
| 1991 | 9,514 | 8,295 | -- | 527 | $692 |
| 1992 | 10,476 | 4,347 | 335 | 752 | 5,042 |
| 1993 | 10,703 | 3,385 | 95 | 1,883 | 5,340 |
| 1994 | 13,974 | 5,261 | 166 | 956 | 7,591 |
| 1995 | 6,377 | 3,630 | 385 | 1,065 | 1,297 |
| 1996 | 5,392 | 3,331 | 98 | 1,695 | 268 |
| 1997 | 6,650 | 2,979 | 75 | 3,184 | 412 |

## C.   The Racking Horse Association Registry

The Racking Horse Association maintains a registry of racking horses.  It planned to close its registry around 1995 to limit the racking horses in the registry to those with a specific gait.

## D.   Petitioners' Farm and Nonfarm Income and Farm Losses

Petitioners had the following amounts of gross receipts and losses from their horse and farm activity from 1982 through 1997:[2]

| Year | Gross receipts[1] | Farm loss not including depreciation | Farm loss including depreciation | Reported Schedule F loss |
|------|------------|------------|------------|------------|
| 1982 | $15,531 | $75,980 | $113,480 | $115,186 |
| 1983 | 3,564 | 93,830 | 132,070 | 132,385 |
| 1984 | 22,015 | 91,922 | 131,341 | N/A |
| 1985 | 27,037 | 59,215 | 94,675 | 104,923 |
| 1986 | 9,670 | 52,846 | 58,096 | 81,077 |
| 1987 | 8,009 | 53,787 | 63,787 | 66,751 |
| 1988 | 24,244 | 32,145 | 35,595 | 39,340 |
| 1989 | 11,708 | 35,596 | 39,628 | 49,130 |
| 1990 | 14,277 | 36,458 | 40,348 | 50,360 |
| 1991 | 18,470 | 36,299 | 41,285 | 45,310 |
| 1992 | 22,900 | 32,516 | 38,209 | 42,535 |
| 1993 | 20,388 | 41,246 | 41,246 | 45,290 |
| 1994 | 25,598 | 39,309 | 43,178 | 45,845 |
| 1995 | 17,890 | 38,128 | 41,247 | 43,596 |
| 1982-95 Total | 241,301 | 719,277 | 914,185 | 861,728 |
| 1996 | 56,300 | 29,900 | 45,158 | 37,689 |
| 1997 | 30,203 | 39,116 | 39,116 | 42,539 |
| 1982-97 Total | 327,804 | 788,293 | 998,459 | 941,956 |

[1] This column is the total income from paragraphs B-7 and B-8 above.

---

[2]   The amounts in the first three columns are from petitioners' financial records.  The amounts in the last column are from petitioners' income tax returns.

Petitioners reported on their income tax returns the following amounts of nonfarm income from 1982 through 1997:

| Year | Wages | Pension income | Nonfarm income |
|------|-------|----------------|----------------|
| 1982 | $239,580 | | $260,552 |
| 1983 | 188,900 | | 240,135 |
| 1984 | N/A | | N/A |
| 1985 | 124,905 | | 148,064 |
| 1986 | 93,500 | | 107,521 |
| 1987 | 101,000 | | 121,102 |
| 1988 | 70,000 | | 78,497 |
| 1989 | 51,200 | $38,492 | 101,178 |
| 1990 | 28,500 | 104,000 | 142,238 |
| 1991 | 54,000 | 47,000 | 116,373 |
| 1992 | 126,883 | 28,000 | 169,090 |
| 1993 | 119,700 | 24,500 | 157,815 |
| 1994 | 144,340 | | 236,966 |
| 1995 | 139,390 | | 154,309 |
| 1982-95 Total | 1,481,898 | 241,992 | 2,033,840 |
| 1996 | 144,854 | | 152,416 |
| 1997 | 144,354 | | 170,963 |
| 1982-97 Total | 1,771,106 | 241,992 | 2,357,219 |

Nonfarm income includes wages and proceeds from the sale of investments and inherited property.

OPINION

A.  Whether Petitioners Operated Their Farm and Horse-Breeding Activity for Profit in 1995

The issue for decision is whether petitioners operated their farm and horse-breeding activity for profit in 1995.  A taxpayer conducts an activity for profit if he or she does so with an actual and honest profit objective.  See Osteen v. Commissioner, 62 F.3d 356, 358 (11th Cir. 1995), affg. in part and revg. on

other issues T.C. Memo. 1993-519; Surloff v. Commissioner, 81 T.C. 210, 233 (1983); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). In deciding whether petitioners operated their horse-breeding activity for profit, we apply the following nine nonexclusive factors: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his or her advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. See sec. 1.183-2(b), Income Tax Regs. No single factor controls. See Osteen v. Commissioner, supra; Brannen v. Commissioner, 722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); sec. 1.183-2(b), Income Tax Regs. Petitioners have the burden of proof. See Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

B.    Whether We Should Treat 1995 as the Startup Year of
      Petitioners' Farm and Horse Activity

Petitioners contend that we should treat 1995 as the startup year of their farm and horse activity because, in 1995, Mrs. Berry began to work full time on the farm, to supervise employees more closely, to organize activities better, and to repair and expand the barn to accommodate more broodmares. Petitioners contend that, even if they did not have a profit motive before 1995, they did in 1995.

It is true that Mrs. Berry worked full time on the farm in 1995. However, we do not view Mrs. Berry's change to full time as the commencement of petitioners' farm and horse activity. The record does not show how much more time Mrs. Berry devoted to the farm in 1995 than in prior years. Mrs. Berry worked part time as Dr. Berry's office manager before 1995. She had a flexible schedule that allowed her to work on the farm when needed. Repairing and expanding the barn was not the commencement of petitioners' farm and horse activity because the barn had accommodated 16 broodmares before 1995. Petitioners' use of improved breeding stock after 1995 is not directly relevant to whether petitioners had a profit motive during 1995.

Petitioners contend that their hay, stud, and horse boarding activities increased in 1995 and thereafter when Mrs. Berry worked on the farm full time. We are not convinced that their activities increased significantly or even at all in 1995 because

petitioners' gross receipts in 1995 from (a) hay were less than in 1981, 1982, 1987, and 1993; (b) stud fees were less than from 1984 to 1987, the same as in 1988, and less than from 1989 to 1994; and (c) boarding fees were less than in 1993 and 1994.

Petitioners contend that this case is like Feistman v. Commissioner, T.C. Memo. 1982-306, affd. 718 F.2d 1110 (9th Cir. 1983), in which we held that a taxpayer changed a stamp and coin collecting hobby to a business. We disagree. During the years in issue, the taxpayer in Feistman undertook activities consistent with those of a retailer and inconsistent with those of a hobbyist. He (a) bought 100 first day covers for each new stamp issued, far more than he needed as a collector; (b) regularly displayed merchandise for sale at shows and swap meets; (c) received a business tax registration certificate with a "retail sales" classification; (d) bought and sold inventory; and (e) received authority from credit card companies to accept charges. The taxpayer in Feistman changed his activity in several respects that showed that he operated it for profit. Petitioners did not.

We do not treat 1995 as the first year of petitioners' horse and farm activity.

C.   Applying the Factors

   1.   Manner in Which the Taxpayer Conducts the Activity

Maintaining complete and accurate books and records, conducting the activity in a manner substantially similar to comparable businesses which are profitable, and making changes in operations to adopt new techniques or abandon unprofitable methods suggest that a taxpayer conducted an activity for profit. See Engdahl v. Commissioner, 72 T.C. 659, 666-667 (1979); sec. 1.183-2(b)(1), Income Tax Regs.

Petitioners maintained a separate general journal and bank account for the farm.  However, they did not have a written business plan, income projections, or profit plans.  This suggests that they did not operate their farm and horse activity for profit.  See Westbrook v. Commissioner, 68 F.3d 868, 873, 878 (5th Cir. 1995) (no written business plan, financial projections, or estimates for return of capital), affg. T.C. Memo. 1993-634; Osteen v. Commissioner, T.C. Memo. 1993-519; cf. Phillips v. Commissioner, T.C. Memo. 1997-128 (written financial plan not required for 32-horse farm where business plan evidenced by action).

Petitioners contend that they had a business plan, which was for Mrs. Berry to work full time on the farm and for them to have at least 11 broodmares.  We disagree.  Petitioners did not credibly show how they intended to make the farm profitable.

Petitioners had at least 11 broodmares in 1983, 1984, and 1985, and had some of their largest losses in those years.

Petitioners contend that they spent cautiously in 1995, which shows that they had a profit objective. We are not convinced that petitioners spent cautiously in 1995. They spent less in 1989, 1990, 1991, and 1993 than they did in 1995. Also, petitioners' level of spending is inconsistent with their claimed business plan of having 11 good-quality broodmares. To comply with their business plan, it appears that petitioners needed to spend more to buy more broodmares. This factor favors respondent.

2. The Expertise of the Taxpayers or Their Advisers

Efforts to gain experience, a willingness to follow expert advice, and preparation for an activity by extensive study of its practices may indicate that a taxpayer has a profit motive. See sec. 1.183-2(b)(2), Income Tax Regs.

By 1995, Mrs. Berry had learned a lot about breeding and raising racking and Tennessee walking horses. People sought her advice about horse breeding. However, there is no evidence that Mrs. Berry sought or acquired expertise in the financial aspects of horse breeding.

Petitioners contend that they consulted Carter, Roberts, and Yeiser as experts. There is no evidence that Carter or Yeiser advised petitioners how to make their farm and horse activity

profitable. At a time not specified in the record, Roberts advised Mrs. Berry to cut her farm expenses, improve her marketing, concentrate on Tennessee walking horses, and increase and improve her broodmare bloodlines. There is no evidence that Mrs. Berry followed his advice, except to buy four broodmares with better bloodlines in 1998. Petitioners did not adequately seek and follow advice relating to the economic aspects of their horse activity. See Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), affg. T.C. Memo. 1985-523; Glenn v. Commissioner, T.C. Memo. 1995-399, affd. without published opinion 103 F.3d 129 (6th Cir. 1996); see also Golanty v. Commissioner, 72 T.C. at 432. This factor favors respondent.

### 3. Taxpayer's Time and Effort

The fact that a taxpayer devotes much time and effort to conducting an activity may indicate that he or she has a profit objective. See sec. 1.183-2(b)(3), Income Tax Regs. Mrs. Berry spent long hours on the activity beginning in February 1995. This factor favors petitioners.

### 4. Expectation That Property Used in the Activity Would Appreciate in Value

A taxpayer may intend to make an overall profit when appreciation in the value of assets used in the activity is realized. See Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967); sec. 1.183-2(b)(4), Income Tax Regs. There is an overall profit if net earnings and appreciation

are enough to recoup losses sustained in prior years. See <u>Bessenyey v. Commissioner</u>, <u>supra</u>. Petitioners concede that they did not expect their land or any asset other than their horses to increase in value but contend that the offspring of the higher quality broodmares that they bought after 1995 are worth more than those born in prior years. We disagree. Petitioners offered no evidence of the value of offspring of higher quality broodmares they bought after 1995. This factor favors respondent.

5. <u>Taxpayer's Success in Other Activities</u>

The fact that a taxpayer previously engaged in similar activities and made them profitable may show that the taxpayer has a profit objective. See sec. 183-2(b)(5), Income Tax Regs. Mrs. Berry's work as office manager at her husband's clinic is not sufficiently similar to operating a farm and horse activity to indicate that she could do so successfully. This factor favors respondent.

6. <u>Taxpayer's History of Income or Losses</u>

A history of substantial losses may indicate that the taxpayer did not conduct the activity for profit. See <u>Golanty v. Commissioner</u>, <u>supra</u> at 427; sec. 1.183-2(b)(6), Income Tax Regs. A taxpayer may have a profit objective even if the activity has a history of losses, see <u>Bessenyey v. Commissioner</u>, <u>supra</u> at 274, because losses during the initial stage of an activity do not necessarily indicate that the activity was not conducted for profit,

see Engdahl v. Commissioner, 72 T.C. at 669; sec. 1.183-2(b)(6), Income Tax Regs. We have said that the startup phase of a horse-breeding activity may be 5 to 10 years for standard bred horses. See Engdahl v. Commissioner, supra.

Petitioners have a long history of substantial losses in their farm and horse activity. Petitioners contend that they incurred losses due to unforeseen circumstances such as Dr. Berry's 2-month illness in 1985 and the reopening of the racking horse registry in 1997. We disagree. We are not convinced that Dr. Berry's illness in 1985 prevented petitioners from buying broodmares in 1992, 1993, 1994, and 1995, because in those years income from his medical practice had increased to more than $119,000, and he had additional income from other sources. Petitioners contend that the reopening of the racking horse registry in 1997 caused their losses in 1995. We disagree. Petitioners have offered no evidence about the reopening of the registry or how the reopening caused their losses in earlier years. This factor favors respondent.

7. Amount of Occasional Profits, If Any

Small occasional profits with large continuous losses do not indicate that the taxpayer had a profit objective. See sec. 1.183-2(b)(7), Income Tax Regs. Petitioners had gross receipts from selling pecans and grains, from providing stud services, and boarding and hauling horses. The record does not indicate the amount of expenses that were related to these activities. Even if

those activities were profitable, those small amounts of receipts do not offset the large losses that petitioners had each year from 1980 to 1995.  This factor favors respondent.

8.  Financial Status of the Taxpayer

The receipt of a substantial amount of income from sources other than the activity, especially if the losses from the activity generate large tax benefits, may indicate that the taxpayer does not intend to conduct the activity for profit.  See sec. 1.183-2(b)(8), Income Tax Regs.  Petitioners had nonfarm income of $154,309 in 1995.  Their nonfarm income exceeded their farm losses from 1980 to 1997.  See Rinehart v. Commissioner, T.C. Memo. 1998-205 (taxpayers lacked a profit objective where taxpayer earned between $166,000 and $170,000 per year during the years in issue).  Petitioners' losses sheltered a large amount of their income in 1995.  This factor favors respondent somewhat.

9.  Elements of Personal Pleasure

The presence of recreational or personal motives in conducting an activity may indicate that the taxpayer is not conducting the activity for profit.  See sec. 1.183-2(b)(9), Income Tax Regs.  A taxpayer's enjoyment of an activity does not show that the taxpayer lacks a profit objective if the activity is, in fact, conducted for profit as shown by other factors.  See Jackson v. Commissioner, 59 T.C. 312, 317 (1972); sec. 1.183-2(b)(9), Income Tax Regs.  However, if the possibility for profit is small compared to the possibility

for gratification, the latter possibility may be the primary motivation for the activity. See <u>White v. Commissioner</u>, 23 T.C. 90, 94 (1954), affd. per curiam 227 F.2d 779 (6th Cir. 1955). Petitioners point out that no person in their family rode horses for pleasure in the year in issue. However, Mrs. Berry testified that she has always enjoyed horses. This factor is neutral.

D. <u>Conclusion</u>

We conclude that petitioners did not operate their farm and horse-breeding activity for profit in 1995 for purposes of section 183.[3]

The record contains information about events that occurred after 1995, on which both parties rely. The post-1995 information shows that the pre-1995 pattern of activity and losses generally

---

[3] Some of petitioners' activities may have been for profit, such as those involving their crops and the hauling and boarding of horses. However, petitioners do not contend that they had more than one activity, and they have not provided any basis for us to decide the amount of their expenses that were related to activities that may have been for profit.

continued through 1998.[4]  Our conclusion would be the same whether or not we considered post-1995 events.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

---

[4]  Petitioners sold one horse for $24,000 in 1996.  This appears to be an anomaly because the sales prices of all of the other horses that they sold after 1995 were similar to sales prices before 1995.  Petitioners received the notice of deficiency in this case in 1997, and they expanded the number of higher quality broodmares in 1998.  Petitioners' actions after 1997 may have been influenced by the pendency of this case and show little or nothing about their intent in 1995.  See <u>Taube v. Commissioner</u>, 88 T.C. 464, 482 (1987); <u>Lundquist v. Commissioner</u>, T.C. Memo. 1999-83; <u>Brockenbrough v. Commissioner</u>, T.C. Memo. 1998-454.